Mr. Lance J. Erickson
Manning & Meyers, Attorneys at Law
4340 North Central Expressway
Dallas, Texas 75206
(214) 823-6600 fax (214) 821-3800
Lance@HOALegal.com
Attorney for Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **IN RE:** | **§** | **CAUSE NO. 23-43977** |
| **MARCOS GONZALEZ-LOPEZ** | **§** | |
| | **§** | |
| **DEBTOR.** | **§** | **CHAPTER 13** |

**MOTION FOR RELIEF FROM AUTOMATIC STAY AGAINST MARCOS GONZALEZ-LOPEZ, WAIVER OF 30-DAY HEARING REQUIREMENT, AND REQUEST FOR HEARING**

TO: THE HONORABLE JUDGE OF THE UNITED STATES BANKRUPTCY COURT

**NOTICE OF LOCAL RULE 4001(b)**

**PERSUANT TO LOCAL BANKRUPTCY RULE 4001-1(A), A RESPONSE IS REQUIRED TO THIS MOTION, OR THE ALLEGATIONS IN THE MOTION MAY BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.**

**NO HEARING WILL BE CONDUCTED ON THIS MOTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS PLEADING WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION. IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT. IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING. IF YOU FAIL TO APPEAR AT THE HEARING, YOUR OBJECTION MAY BE STRICKEN. THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MANNER.**

COMES NOW, Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs, the "Movant," a secured creditor in the above-entitled and numbered case, and files this, their Motion To Lift Automatic Stay pursuant to Section 362 of the Bankruptcy Code and in support thereof would respectfully show the Court the following:

## I. JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.

2. The matters raised in this Motion constitute core proceedings within the meaning of 28 U.S.C. §157(b)(2)(G).

3. Venue of these proceedings is proper in this Court pursuant to 28 U.S.C. § 1409.

## II. FACTS

4. Marcos Gonzalez-Lopez filed a voluntary Chapter 13 case on December 29, 2023.

5. Marcos Gonzalez-Lopez is the record title holder to the real property, with all improvements thereon, located at 107 Legendary Court, Newark, TX 76071, and is thus a member of Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs. Said property is more particularly described as follows:

> Lot Twelve R (12R), Block B, of Chisholm Springs Subdivision (Chisholm Springs Subdivision), located in Wise County, Texas, according to the Map or Plat thereof recorded in Cabinet C, Slide(s) 177-179, (Re-Filed in Cabinet C, Slide(s) 184-186), Map Records of Wise County, Texas. Together with the right of Ingress and Egress over and across Lot 1R, Block A, Chisholm Springs Subdivision (Chisholm Springs Subdivision), located in Wise County, Texas, according to the Map or Plat thereof recorded in Cabinet C, Slide(s) 177-179, (Re-Filed in Cabinet C, Slide(s) 184-186)(Re-Platted in Cabinet C, Slide(s) 271-272 as to portions of Block F) in the Map Records of Wise County, Texas.; and
>
> Also known as:
>
> 107 Legendary Court, Newark, TX 76071, (hereinafter "the Property")

6. The Property is burdened by, among other things, the Declaration of Covenants, Conditions and Restrictions for Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs, executed by Jackson-Shaw/Chisholm Springs Limited Partnership, as Declarant, and recorded on or about November 14, 2006, at Document Number 397566 in the Real Property Records of Wise County, Texas, including any amendment thereof and supplements thereto and entitled "Declaration of Covenants, Conditions, and Restrictions for Chisholm Springs" (hereinafter "Declaration").

Marcos Gonzalez-Lopez, by accepting a deed to the property, whether or not it was so expressed in such deed or other conveyance, is deemed to covenant and agree to pay to Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs certain assessments together with late fees,

interest, costs and reasonable attorney's fees. These assessments are levied by the Association and are used, in part, to provide for normal recurring maintenance charges for the Common Properties, as well as improvements to the Common Properties, which are for the use and benefit of all members of the Association as well as other expenses determined by Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs Board of Directors to benefit the Association as a whole.

7. The assessments and certain charges are also secured by a Lien in favor of the Association against each property. The power to charge assessments is set forth in Article 7, Section 7.2, of the Declaration which states in pertinent part as follows:

*7.2 Personal Obligation. An owner is obligated to pay assessments levied by the board against the owner or his lot. An owner makes payment to the Association at its principal office or at any other place the board directs. Payments must be in full regardless of whether an owner has a dispute with the Board, ACC or with the Association, another owner, or any other person or entity regarding any matter to which this Declaration pertains. No Owner may exempt himself from his assessment liability by waiver of the use or enjoyment of the common area or by abandonment of his lot. An owner's obligation is not subject to offset by the owner, nor is it contingent on the Association's performance of the Association's duties. Payment of assessment is both a continuing affirmative covenant personal to the owner and a continuing covenant running with the lot.*

A copy of said Declaration is attached to this Motion as "Exhibit A" and incorporated by reference.

8. Debtor was in default in the amount of $2,912.90 at the time of the bankruptcy filing.

9. Debtor has failed to provide timely notice of the bankruptcy filing to Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs, a secured creditor.

10. The Chapter 13 Plan does not provide adequate protection to Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs, a secured creditor, and does not allow for payments to be made through the standing Chapter 13 Trustee.

11. The Debtor is also in default on their obligation to Movant in that Debtors have failed to make their Post Bankruptcy Assessment payments when due and owing pursuant to the terms of the above described Declaration.

12. Debtor has failed to make Post Bankruptcy Assessment payments. Debtor owes $3,339.59 in Post Bankruptcy Assessment Payments as of the time of the filing of this motion. This amount includes other charges incurred on behalf of Movant in relation to this bankruptcy action and in relation to fines, fees, and charges in relation to the Debtor's account.

Article 7, Section 7.9, of the Declaration provides that in the event of non-payment by any Owner of any assessments or allowed charge, the Movant may enforce non-payment by the foreclosure of the Debtor's Property or institute suit against the Debtor as they are personally obligated to pay the assessment. Article 7, Section 7.9, Section 7.9.3, and section 7.9.5, of the Declaration, states in pertinent part as follows:

> *7.9 <u>Assessment Lien.</u> Each owner, by accepting an interest in or title to a lot, whether or not it is so expressed in the instrument of conveyance, covenants and agrees to pay assessments to the Association. Each assessment is a charge on the lot and is secured by a continuing lien on the lot. Each owner, and each prospective owner is placed on notice that his title may be subject to the continuing lien for assessments attributable to a period prior to the date he purchased his lot.*
>
> > *7.9.3 <u>Perfection of Lien.</u> The Association's lien for assessments is created by recordation of this Declaration, which constitutes record notice and perfection of the lien. No other recordation of a lien or notice of lien is required. However, the Association, at its option, may cause a notice of the lien to be recorded in the court's real property records.*
> >
> > *7.9.5 <u>Foreclosure of Lien.</u> The assessment lien may be enforced by judicial or nonjudicial foreclosure. A nonjudicial foreclosure must be conducted in accordance with the provisions applicable to the exercise of powers of sale set forth in Section 51.002 of the Texas Property Code, or in any manner permitted by law. In any foreclosure, the owner is required to pay the Association's costs and expenses for the proceedings, including reasonable attorneys' fees. The Association has the power to bid on the lot at foreclosure sale and to acquire, hold, lease, mortgage, and convey same.*

13. By failing to provide notification of the bankruptcy filing to the creditor in a timely manner, Creditor was unable to file a Proof of Claim in the allotted time frame. Therefore, Debtor has not provided adequate protection to Movant. Consequently, Movant lacks adequate protection of its interest in the property.

14. By failing to make the regular Post-Petition assessment payments pursuant to the Declaration, Debtor has not provided adequate protection to Movant. The plan provides that the Debtor

shall make adequate protection in the form of ongoing monthly payments paid directly to Movant. Debtor's delinquency indicates either a willful non-compliance with the plan or an inability to meet the terms of the plan. As such, causes exist for the lifting of the stay.

15. Movant has no remedy available to it other than to seek relief from the automatic stay.

16. Movant specifically requests permission from this Honorable Court to communicate with Debtor and Debtor's counsel to the extent necessary to comply with applicable non-bankruptcy law.

17. Movant has had to retain counsel to represent it before this Court and is incurring legal expenses and attorney's fees for which it is entitled and to reimbursement under the terms of the Declaration.

## III. RELIEF REQUESTED

18. Movant request that the Court lift the stay for cause and for lack of adequate protection pursuant to 11 U.S.C. § 362(d)(1) in order to allow them to proceed to foreclose their lien against the Property.

19. Alternatively, Movant requests that the Court lift the stay pursuant to 11 U.S.C. §362(d)(2) because the Property is not needed for an effective reorganization.

20. Movant requests that they be granted reasonable attorneys' fees in the amount of $1,350.00 for filing and prosecuting this Motion.

21. Movant requests that the provision of Fed. R. Bankr. P. 4001(a)(3) be waived and that Movant be permitted to immediately enforce and implement any order lifting the automatic stay.

## IV. PRAYER

WHEREFORE PREMISES CONSIDERED, Movant prays for an order lifting the automatic stay to permit Movant to foreclose and gain possession of the Real Property and for such other relief to which the Movant may be justly entitled.

RESPECTFULLY SUBMITTED,

/s/ Mr. Lance J. Erickson
Mr. Lance J. Erickson, Manning & Meyers, Attorneys at Law
SB#24072509

4340 North Central Expressway
Dallas, Texas 75206
(214) 823-6600 fax (214) 821-3800
Lance@HOALegal.com
Attorney for Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs

## CERTIFICATE OF CONFERENCE

I hereby certify that on September 25, 2026, our office called the offices of Warren V. Norred, Norred Law PLLC, attorney for the Debtor regarding this motion. The debtor's Attorney is opposed to the filing of this Motion.

/s/ Mr. Lance J. Erickson
Mr. Lance J. Erickson
Attorney for Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing Motion of Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs to Lift Stay was served via electronic means on September 29, 2026, upon the following:

/s/ Mr. Lance J. Erickson
Mr. Lance J. Erickson
Attorney for Chisholm Springs Homeowners Association, Inc. a/k/a Chisholm Springs

United States Trustee
Pam Bassel
Northern Bankruptcy District
7001 Blvd 26
Suite 150
North Richland Hills, TX 76180

All Parties who have filed a Notice of Appearance.

Debtor's attorney
Warren V. Norred
Norred Law PLLC
515 E. Border Street
Arlington, TX 76010

# EXHIBIT A

D220179927 7/28/2020 8:36 AM PGS 57 Page 1 of 57 Fee: $243.00 Submitter: CSC ERECORDING SOLUTIONS
Electronically Recorded by Tarrant County Clerk in Official Public Records
Mary Louise Nicholson

Unofficial Copy

**NOTICE OF FILING OF DEDICATORY INSTRUMENTS**
**FOR**
**CHISHOLM SPRINGS**
**[Declaration of Covenants, Conditions and Restrictions for Chisholm Springs]**

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | |
| | § | **KNOW ALL MEN BY THESE PRESENTS:** |
| **COUNTY OF TARRANT** | § | |

This **NOTICE OF FILING OF DEDICATORY INSTRUMENTS FOR CHISHOLM SPRINGS** (this "Notice") is made this 14 day of July, 2020, by Chisholm Springs Homeowners Association, Inc. (the "Association").

**WITNESSETH**

**WHEREAS,** Jackson-Shaw/CHISHOLM SPRINGS Limited Partnership ("Declarant") recorded that certain instrument entitled "Declaration of Covenants Conditions & Restrictions for Chisholm Springs" on or about November 14, 2006, as Document No. 397566 at Volume 1751, Page 41 *et seq.,* of the Real Property Records of Wise County, Texas, as amended pursuant to that certain Amendment to Declaration of Covenants, Conditions & Restrictions for Chisholm Springs recorded on March 29, 2010 as Instrument No. 2010-54618 of the Real Property Records of Wise County, Texas (collectively, the "Declaration"), as such may be further amended and/or supplemented from time to time; and

**WHEREAS,** the Association is the property owners' association created by Declarant to manage or regulate the planned development subject to the Declaration, which development is more particularly described in the Declaration; and

**WHEREAS,** Section 202.006 of the Texas Property Code provides that a property owners' association must file each dedicatory instrument governing the association that has not been previously recorded in the real property records of the county in which the planned development is located; and

**WHEREAS,** the Association desires to record the Declaration attached hereto as **Exhibit "A"** in the Real Property Records of Tarrant County, Texas, pursuant to and in accordance with Section 202.006 of the Texas Property Code.

**NOW, THEREFORE,** the dedicatory instrument attached hereto as **Exhibit "A"** is a true and correct copy of the original and is hereby filed of record in the Real Property Records of Tarrant County, Texas, in accordance with the requirements of Section 202.006 of the Texas Property Code.

**IN WITNESS WHEREOF**, the Association has caused this Notice to be executed by its duly authorized agent as of the date first above written.

**CHISHOLM SPRINGS HOMNEOWNERS ASSOCIATION, INC.**, a Texas non-profit corporation

By: [signature]

Printed Name: Marcus Pickel

Title: President

STATE OF TEXAS §
§
COUNTY OF WISE §

BEFORE ME, the undersigned authority, a Notary Public in and for said county and state, on this day personally appeared Marcus Pickel, President of Chisholm Springs Homeowners Association, Inc., known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed, in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 14th day of July, 2020.

[signature]
Notary Public in and for the State of Texas

JENNIFER MCGLOTHLIN
Notary Public, State of Texas
Comm. Expires 01-10-2023
Notary ID 131849785

G/Notice.Ded/ChisholmSprings-NOF2020

Unofficial Copy



4833-1341-8946, v. 2

**Exhibit "A"**

Declaration

[on following pages]

Unofficial Copy

Doc 397566 Bk OR Vol 1751 Pg 41

# DECLARATION OF COVENANTS, CONDITIONS & RESTRICTIONS FOR CHISHOLM SPRINGS

Unofficial Copy



ClibPDF - www.fastio.com

# DECLARATION OF COVENANTS, CONDITIONS & RESTRICTIONS FOR CHISHOLM SPRINGS

STATE OF TEXAS §
§ KNOW ALL PERSONS BY THESE PRESENT
COUNTY OF WISE §

THIS DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS (The "Declaration") is made by **Jackson-Shaw/CHISHOLM SPRINGS Limited Partnership** (The "Declarant").

WITNESSETH

WHEREAS, **Jackson-Shaw/CHISHOLM SPRINGS Limited Partnership.**, (the "Declarant") a Texas Limited Partner, is the developer and sole owner of all that real property platted as **CHISHOLM SPRINGS, PHASE I**, (the "Addition") an Addition located in Wise County, Texas, (the "County"), Texas, according to the Final Plat thereof (the "Plat") recorded in Cabinet C, Sleeve 053, Plat Records of Wise County, Texas, as amended by revised plat of such subdivision recorded in Cabinet C Slide 178 all of said property being more specifically described on the Plat of the Addition which is incorporated herein and made a part hereof for all purposes (the "Property"). The property is herein called "**CHISHOLM SPRINGS**" and is herein also referred to as the "Community",

WHEREAS, **CHISHOLM SPRINGS** shall consist of (i) property that has been subdivided into two hundred forty six (246) residential Lots (hereinafter defined) located in the Additions (hereinafter defined) developed within the Community and (ii) 12 Common Area lots (hereinafter defined) located within the Community,

WHEREAS, Declarant desires and proposes to establish and implement plans and aesthetic considerations in order to create a residential community on the Property and, to this end, desires to subject the Property to the covenants, conditions, restrictions, and easements hereinafter set forth (sometimes collectively referred to herein as the "Covenants, Conditions and Restrictions")

WHEREAS, Declarant desires to impose said Covenants, Conditions and Restrictions on the Property and yet maintain reasonable flexibility to respond to changing and unforeseen circumstances as to control and maintain the quality and distinction of the Property,

WHEREAS, Declarant has deemed it desirable to create a homeowners' association to own and/or maintain the Common Areas (hereinafter defined) and to which would be delegated and assigned the powers of administering and enforcing the Covenants, Conditions and Restrictions contained herein and collecting and disbursing the assessments and charges hereinafter created, and

WHEREAS, Declarant has caused or will cause such homeowners association to be incorporated under the Texas Non-Profit Corporation Act, under the name of **CHISHOLM SPRINGS HOMEOWNERS ASSOCIATION, INC.** (the "Association").

NOW, THEREFORE, Declarant declares that the Property is and shall be held, transferred, sold, conveyed and occupied subject to the Covenants, Conditions and Restrictions as follows AND IT IS



Unofficial Copy

ClibPDF - www.fastio.com

SPECIFICALLY UNDERSTOOD AND AGREED THAT ALL LOTS SITUATED WITHIN THE PROPERTY SHALL BE SUBJECT TO THIS DECLARATION AND ALL OWNERS OF LOTS SHALL BE SUBJECT TO THE COVENANTS, CONDITIONS AND RESTRICTIONS SET FORTH HEREIN, AND THE ASSOCIATION FORMED PURSUANT HERETO SHALL BE **MANDATORY** FOR ALL OWNERS OF ALL LOTS AND ALL OF SUCH OWNERS MUST BE A PART OF THE ASSOCIATION.

***Declarant has established this Declaration to provide a governance structure and a system of standards and procedures for the overall development, administration, maintenance, and preservation of CHISHOLM SPRINGS.***

## Article i
## CREATION OF THE COMMUNITY

i.1. Purpose and Intent.

Declarant, as the owner of the real property described in Exhibit "A," intends by Recording this Declaration to create a general plan of development for the master planned community known as **CHISHOLM SPRINGS**. This Declaration provides a reasonable procedure for the future expansion of the subdivision to include additional real property as Declarant deems appropriate and provides for the overall development, administration, maintenance, and preservation of the real property now and hereafter comprising **CHISHOLM SPRINGS**. An integral part of the development plan is the creation of the nonprofit corporation to be known as **CHISHOLM SPRINGS HOMEOWNERS ASSOCIATION, INC.**, an association comprised of all owners of real property in the **CHISHOLM SPRINGS** planned community, to own, operate, and/or maintain various common areas and community improvements and to administer and enforce this Declaration and the other Governing Documents referred to in this Declaration.

This document does not and is not intended to create a condominium within the meaning of the Texas Condominium Act, Tex. Prop. Code Ann., Section 81.601, et seu. (Vernon 1984).

i.2. Binding Effect and Term.

All property described in Exhibit "A," and any additional property which is made a part of the **CHISHOLM SPRINGS** community in the future by Recording one or more Supplemental Declarations, shall be owned, conveyed, used, and otherwise encumbered subject to all of the provisions of this Declaration, which shall run with the title to such property. This Declaration shall be binding upon all Persons having any right, title, or interest in any portion of the **CHISHOLM SPRINGS** community, their heirs, successors, successors-in-title, and assigns.

This Declaration shall be enforceable by Declarant, the Association, any Owner, under the provisions herein and their respective legal representatives, heirs, successors, and assigns for a term of 20 years from the date the Declaration is recorded. After such 20-year period, this Declaration shall extend automatically for successive 10-year periods unless a majority of the then Owners sign and Record, within the year preceding any extension, an instrument which terminates this Declaration.

Nothing in this Section shall be construed to permit termination of any easement created in this Declaration without the consent of the holder of such easement. If any provision of this Declaration is determined by judgment or court order to be invalid, or invalid as applied in a particular instance, such determination shall not affect the validity of other provisions or applications.

Unofficial Copy



ClibPDF - www.fastio.com

i.3. Governing Documents.

The Governing Documents may be supplemented by additional covenants, restrictions, and easements applicable to particular Phases within **CHISHOLM SPRINGS**. Nothing in this Section shall preclude the Recording of a Supplemental Declaration or other instrument applicable to any portion of **CHISHOLM SPRINGS** (with the consent of the Owner of such property) which contains additional restrictions or more restrictive provisions; provided, any such Recording is subject to Article 11, unless otherwise permitted by Article 12. The Association may, but shall not be required to, enforce any such covenants, restrictions, or other instruments, which are otherwise enforceable.

The Governing Documents shall apply to Owners as well as occupants of Lots and their respective tenants, guests, and invitees. Any lease of a Lot shall provide that the lessee and all occupants of the leased Lot shall be bound by the terms of the Governing Documents.

In the event of a conflict between Texas laws, the Articles (of Incorporation), the Declaration, and the By-Laws, the provisions of Texas law, the Declaration, the Articles, and the By-Laws (in that order) shall prevail. In the event of a conflict between or among the Governing Documents and any additional covenants or restrictions, and/or the provisions of any other rules or policies governing any Phase, the Governing Documents shall control.

## ARTICLE 1
## DEFINITIONS

DEFINITIONS. The following words and phrases, whether or not capitalized, have specified meanings when used in the Governing Documents, unless a different meaning is apparent from the context in which the word or phrase is used.

1.1. "ACC" means that Architectural Control Committee of the Association.

1.2. "ASSESSMENT" means any charge levied against a lot or owner by the Association, pursuant to the Governing Documents or State law.

1.3. "ASSOCIATION" means the association of owners of all lots in the Property, initially organized as **The Homeowners Association of CHISHOLM SPRINGS, Inc.**, a Texas nonprofit corporation.

1.4. "BOARD" means the Board of Directors of the Association.

1.5. "BUILDER" means any homebuilder constructing the initial Residence upon a Lot in the normal course of conducting its business for profit.

1.6. "Left intentionally blank".

1.7. "COUNTY" means Wise County, Texas, in which the Property is located.

1.8. "COMMON AREA(S)" or "COMMON PROPERTIES" means portions of the Property as described in or on the Plat that do not constitute residential lots. Common Area Lots



Unofficial Copy

ClibPDF - www.fastio.com

include but are not limited to lots: 1R A, 1R B, 2R A, 58R B, 83R B, 1R G, 10R F, 40R F, 9R H, 47R H, Accordingly, the Common Area means those portions of the Property designated as such on the Plat, including any recreational centers, swimming pools, ponds, parking lots, landscaping, amenities or similar areas or features. The Common Areas also includes: (i) any areas within the Property owned by the City, the Association, or any other governmental entity, but which may be maintained by the Association; (ii) any landscape, wall maintenance, pedestrian access or maintenance easements reflected on the Plat, required by the City or recorded by separate instrument; (iii) all streets within the Property and (iv) those areas, if any, which are owned by an Owner. Common Area shall also include all improvements on or to any portion of any of the areas described in the preceding sentence. Declarant shall at all times have and retain the right but without obligation whatsoever, to effect minor redesigns or reconfigurations of the Common Area and to execute any open space declarations applicable to the Common Area which may be permitted in order to reduce property taxes, and to take whatever steps as may be appropriate to lawfully avoid or minimize the imposition of federal and state advalorem and/or income taxes.

1.9. "DECLARANT" means **Jackson-Shaw/Chisholm Springs Limited Partnership**, the developer of the Property, and/or the successors and assigns of **Jackson-Shaw/Chisholm Springs Limited Partnership**, which acquire any portion of the Property for the purpose of development and which are designated a Successor Declarant by **Jackson-Shaw/Chisholm Springs Limited Partnership**, or by any such successor and assign, in a recorded document.

1.10. "DECLARANT CONTROL PERIOD" means that period of time, beginning the date this Declaration is recorded, during which Declarant controls the operation of the Association, pursuant to "EXHIBIT B", of this Declaration.

1.11. "DECLARATION" means this document, as it may be amended from time to time.

1.12. "DESIGN GUIDELINES" shall mean and refer to those particular standards, restrictions, guidelines, recommendations and specifications applicable to all aspects of construction, placement, location, alteration, maintenance and design of any improvements within the Property, and all amendments, modifications, supplements and interpretations thereof.

1.13. "DEVELOPMENT PERIOD" means the 20-year-period beginning the date this Declaration is recorded, during which the Property is being developed, constructed, or marketed. The Development Period terminates automatically when a dwelling is constructed and completed on every lot in the Property. Declarant may terminate the Development Period at any time by recording a notice of termination.

1.14. "GOVERNING DOCUMENTS" means, singly or collectively as the case may be, this Declaration, and any applicable Supplemental Declaration, the Plat, the Bylaws, the Association's Articles of Incorporation, and the rules of the Association, as any of these may be amended from time to time. An appendix, exhibit, schedule, or certification accompanying a Governing Document is a part of that Governing Document.

1.15. "LOT" means a portion of the Property intended for independent ownership, on which there is or will be constructed a dwelling, as shown on the Plat. Where the context indicates or requires, "lot" includes all improvements thereon and any portion of a right-



Unofficial Copy

ClibPDF - www.fastio.com

of-way that customarily is used exclusively by and in connection with the lot. "Lot" shall mean and refer to any one (1) of the enumerated plots or tracts of land shown upon a Final Plat, and "Lots" shall mean and refer to more than one (1) of same, and shall include all Platted Developed Lots as well as all Platted Undeveloped Lots, as such terms are defined in this Section 1.21 below.

1.16. "MAJORITY" means more than half.

1.17. "MANAGING AGENT" means any Person or Entity who has been engaged and designated by the Board to manage the daily affairs and operations of the Association.

1.18. "MEMBER" means a member of the Association.

1.19. "OWNER" means a holder of a recorded fee simple title to a Lot. Declarant is the initial owner of all lots. Contract sellers and mortgagees who acquire title to a lot through a deed in lieu of foreclosure or through judicial or nonjudicial foreclosure are owners. Persons or entities having ownership interests merely as security for the performance of an obligation are not owners.

1.20. "PHASE" means a particular phase developed upon the Property. Declarant may impose additional or different restrictions on each Phase. If Declarant annexes additional property into the Property as provided in Section 12.3, it may designate the area annexed as a particular Phase, and may impose, as provided in Section 12.3, additional or different restrictions on such area.

1.21. "PLAT" means all plats, singly and collectively, recorded in the Real Property Records of Wise County, Texas and pertaining to the **CHISHOLM SPRINGS** community (referred to as **CHISHOLM SPRINGS**). Addition(s) to the County of Wise, including (i) the Preliminary Plat, and thereafter the Final Plat, for any Phase of the Property submitted to and approved by the City, or any other applicable governmental entity; (ii) after recordation thereof, the final Plat for any Phase of the Property as recorded in the Records of Wise County, Texas; (iii) any replat of, or amendment to, the foregoing made by Declarant in accordance with this Declaration; and (iv) any final recorded plat of any additional property annexed into the Property pursuant to Section 12.3. Any of the specified definitions of Plat include, without limitation, any and all dedications, limitations, restrictions, easements, and reservations shown on the plat, as it may be amended from time to time.

1.22. "RESIDENCE" or "RESIDENTIAL DWELLING" means a single family detached residence constructed upon a Lot in conformance with this Declaration.

1.23. "STREET" means any paved road that is typically within a fifty-foot (50') right-of-way and serves the front or side of a Lot upon which a Residence is constructed.

1.24. "STRUCTURE" means any structure (other than a Residence), fence, driveway, sidewalk, planting, landscaping, irrigation system, wall, tennis court, swimming pool, outbuilding, playground equipment, or other improvement of any kind or type.

1.25. "PROPERTY" means all the land (referred to as "the Land" and/or "the Property" and/or "the Subdivision" herein) subject to this Declaration and all improvements, easements,



ClibPDF - www.fastio.com

Unofficial Copy

rights, and appurtenances to the land. The name of the Property is **CHISHOLM SPRINGS.** The Property is located on land described in "EXHIBIT A", to this Declaration, and includes every residential lot thereon.

1.26. "RESIDENT" means an occupant of a dwelling, regardless of whether the person owns the lot.

1.27. "RULES" means rules and regulations adopted by the board in accordance with the Governing Documents.

## ARTICLE 2
## PROPERTY SUBJECT TO DOCUMENTS

2.1. PROPERTY. The real property described in "EXHIBIT A" is held, transferred, sold, conveyed, leased, occupied, used, insured, and encumbered subject to the terms, covenants, conditions, restrictions, liens, and easements of this Declaration, including Declarant's representations and reservations as set forth herein, which run with the Property and bind all parties having or acquiring any right, title, or interest in the Property, their heirs, successors, and assigns, and to the benefit of each owner of the Property.

2.2. ADDITIONAL PROPERTY. Additional real property may be annexed to the Property and subjected to the Declaration and the jurisdiction of the Association by the Declarant as permitted herein. Annexation of additional property is accomplished by recording a declaration of annexation, including an amendment of "EXHIBIT A", in the county's real property records.

2.3. PLAT DEDICATIONS, EASEMENTS & RESTRICTIONS. In addition to the easements and restrictions contained in this Declaration, the Property is subject to the dedications, limitations, easements, restrictions, maintenance agreements, and reservations shown or cited on the plat, which is incorporated herein by reference. Each owner, by accepting an interest in or title to a lot, whether or not it is so expressed in the instrument of conveyance, covenants and agrees to be bound by the plat, and further agrees to maintain any easement that crosses his lot and for which the Association does not have express responsibility.

2.4. COMMON AREAS. The common area of the Property consists of the following components on or adjacent to the Property, even if located on a lot or a public right-of-way:

2.4.1. All of the Property, save and except the numbered Lots unless said numbered Lots are designated as common area, or the lot does not have a residential graded buildable pad meant for a residential dwelling, or the following lots described as 1R A, 1R B, 2R A, 58R B, 83R B, 1R G, 10R F, 40R F, 9R H, 47R H, and including all the lettered tracts without residential buildable pad sites meant for a residential dwelling;

2.4.2. The private streets, being all streets and cul-de-sacs within the Property that are not publicly dedicated;



Unofficial Copy

.ClibPDF - www.fastio.com

2.4.3. Fixtures and improvements on or appurtenant to the private streets and which are intended for the use, operation, and/or maintenance of the private streets, including but not limited to curbs, street lamps, street name signs, and traffic signs;

2.4.4. The formal entrances to the Property, including (if any) the signage, access gates, landscaping, electrical and water installations, planter boxes and fencing;

2.4.5. Any modification, replacement, or addition to any of the above-described areas and improvements;

2.4.6. Personal property owned by the Association, such as any books and records, office equipment, and pool supplies and furniture (if any).

## ARTICLE 3
## PROPERTY EASEMENTS AND RIGHTS

3.1. GENERAL. In addition to other easements and rights established by the Governing Documents, the Property is subject to the easements and rights contained in this Article.

3.2. EASEMENT FOR ENTRY FEATURE & SCREENING WALL. The Association is hereby granted a perpetual easement (the "Maintenance Easement") over each lot that abuts or contains a portion of the Property's formal entrances or the Property's screening wall, fence, or berm, for the purposes stated in this Section, regardless of whether or how the plat shows the easement, entry features, or screening wall, fence, or berm.

3.2.1 Purpose of Easement. The purpose of the Maintenance Easement is to provide for the existence, repair, improvement, and replacement of the Property's formal entrances and screening wall, fence, or berm, to be maintained by the Association as a common area. In exercising this Maintenance Easement, the Association may construct, maintain, improve, and replace improvements reasonably related to the screening or entrance of a residential subdivision, including: access gates, screening walls; fences and/or berms; planter beds, landscaping, and plant material; electrical and water meters and equipment, including light fixtures and sprinkler systems; and signage relating to the Property.

3.3. MONUMENT EASEMENT & STREETLIGHT EASEMENT. The Association is granted a perpetual easement (the "Monument Easement") over each lot that contains a standard street name monument ("Monument Lot") and/or a standard streetlight ("Streetlight Lot") for the purpose of repairing, removing, and replacing the monument and/or streetlight as deemed necessary by the Association. In addition to the easement granted herein, the Association has the temporary right, from time to time, to use as much of the surface of the Monument Lot and/or Streetlight Lot as may be reasonably necessary for the Association to perform its contemplated work on the Monument Easement and/or Streetlight Easement. The owner of a Monument Lot and/or Street light Lot may not remove, deface, cover, or screen the monument or streetlight or otherwise interfere with the intended use and purpose of the monument and/or streetlight.

3.4. OWNER'S MAINTENANCE EASEMENT. Every owner is granted an access easement over adjoining lots and common areas for the maintenance or reconstruction of his



Unofficial Copy
ClibPDF - www.fastio.com

dwelling and other improvements on his lot, provided exercise of the easement does not damage or materially interfere with the use of the adjoining lot or common area. Requests for entry to an adjoining lot or common area must be made to the owner of the adjoining lot, or the Association in the case of the common areas, in advance for a time reasonably convenient for the adjoining owner, who may not unreasonably withhold consent. If an owner damages an adjoining lot or common area in exercising this easement, the owner is obligated to restore the damaged property to its original conditions, at his expense, within a reasonable period of time.

3.5. OWNER'S INGRESS/EGRESS EASEMENT. Every owner is granted a perpetual easement over the Property's streets, as may be reasonably required, for vehicular ingress to and egress from his lot.

3.6. ASSOCIATION'S ACCESS EASEMENT. Each Owner grants to the Association, the Board, and the Declarant the right to access, repair and maintain all facilities and improvements within any wall, entry, fence, landscape or other similar easement as recorded on any Plat. Furthermore, the Association and the Developer are granted an easement of access and entry to every lot and common area to perform and to enforce architectural and use restrictions, to respond to emergencies, and to perform any other duties required by the Governing Documents. By acquisition of a Lot, each Owner hereby grants, creates and conveys unto the Association, the other adjacent Owners and the Declarant a perpetual Drainage Easement over, through, under and across the Owner's Lot for the purpose of permitting runoff and/or storm water to drain from other adjacent Lots over, through, under and across the Owner's Lot(s). Without limiting the foregoing, in order to facilitate drainage from the Property subject to the Declaration over, through, under and across the Owner's Lot, each Owner hereby agrees that the Declarant or the Association, as the case may be, shall have the right to enter onto the Owner's Lot at any time to (i) prevent possible interference with the Drainage Easement and to remove possible hazards from the Drainage Easement area, (ii) prevent the construction or placement of any building, structure or other obstruction with the Drainage Easement area which may endanger or interfere with the efficient and convenient use of the Drainage Easement, (iii) grade, improve, construct, reconstruct, repair and perpetually maintain swales within the Drainage Easement area, and (iv) or regrade portions of the Drainage Easement area necessary or appropriate to permit drainage as generally described herein or as approved or required by appropriate governmental authorities. Notwithstanding any of the foregoing rights of the Association or the Developer, each Owner hereby agrees to maintain the Drainage Easement area at such Owner's sole cost and expense. If any structures or other obstructions are constructed, created or placed by any owner within the Drainage Easement area without the prior written consent of the Association and the Declarant, the Declarant or the Association shall have the right to remove such structure or obstruction at the sole cost of such Owner.

3.7. UTILITY EASEMENT. The Association may grant permits, licenses, and easements over common areas for utilities, roads, and other purposes necessary for the proper operation of the Property. A company or entity, public or private, furnishing utility service to the Property, is granted an easement over the Property for ingress, egress, meter reading, installation, maintenance repair, or replacement of utility lines and equipment, and to do anything else necessary to properly maintain and furnish utility service to the Property; provided, however, this easement may not be exercised without

Unofficial Copy



ClibPDF - www.fastio.com

prior notice to the board. Utilities may include, but are not limited to, water, sewer, trash removal, fiber optic cable, electricity, gas, telephone, master or cable television, and security.

3.8. SECURITY. The Association may, but is not obligated to, maintain or support certain activities within the Property designed, either directly or indirectly, to improve safety in or on the Property. Each owner and resident acknowledges and agrees, for himself and his guests, that Declarant, the Association, and its directors, officers, committees, agents, and employees are not providers, insurers, or guarantors of security within the Property. Each owner and resident acknowledges and accepts his sole responsibility to provide security for his own person and property, and assumes all risks for loss or damage to same. Each owner and resident further acknowledges that Declarant, the Association, and its directors, officers, committees, agents, and employees have made no representations or warranties, now has the owner or resident relied on any representation or warranty, express or implied, including any warranty of merchantability or fitness for any particular purpose, relative to any fire, burglar, and/or intrusion systems recommended or installed, or any security measures undertaken within the Property. Each owner and resident acknowledges and agrees that Declarant, the Association, and its directors, officers, committees, agents, and employees may not be held liable for any loss or damage by reason of failure to provide adequate security or ineffectiveness of security measures undertaken.

3.9. RISK. Each resident uses all common area amenities (if any) at his own risk. Each resident is solely responsible for his own safety and that of his guests. The Association and the Declarant disclaims any and all liability or responsibility for injury or death occurring from use of the common area. By acquisition of a Lot, each Owner acknowledges that he has read the Governing Documents and accepts his sole responsibility for his own safety and that of his guests when using the common area, and assumes any and all risks for loss, injuries and death arising out of such use.

3.10 RESIDENTIAL CONSTRUCTION LIABILITY ACT. Without waiving any rights under law or equity Owners acknowledge, covenant and agree that residential construction defect claims regarding any residence or Lot against the Declarant and/or Builder are controlled by the Texas Residential Construction Act (Texas Property Code § 27.00 et. seq., as amended), which preempts The Texas Deceptive Trades Practices Act (Texas Business & Commerce Code § 17.41 et seq., as amended) and any other law.

3.11 EPA/TCEQ COMPLIANCE. The Owner of each lot and/or the Builder of each residence agree to comply with all EPA, TCEQ or other federal or state regulatory authority rules and regulations regarding erosion control and compliance with a Storm Water Pollution Prevention Plan affecting the Lots (the "Plan"), which include elements necessary for compliance with the nationwide general permit for construction activities administered by the EPA under the National Pollutant Discharge Elimination System. Each Owner and/or Builder acknowledge that the Declarant will not bear the cost or responsibility for complying with a "Plan" on any Lot upon the sale of that particular Lot within the subdivision to each owner and/or Builder. The cost and responsibility to comply with the "Plan" shall be the responsibility of the Owner of each lot or the Builder of each residence and the responsible Owner and/or the responsible Builder agrees to reimburse Declarant the cost of any applicable EPA fines, if any, due to said Owners and/or said Builders non-compliance with the "Plan".



ClibPDF - www.fastio.com

Unofficial Copy

## ARTICLE 4
## ARCHITECTURAL COVENANTS AND CONTROL

4.1. PURPOSE. Because the lots are part of a single, unified community, the Association has the right to regulate the design, use, and appearance of the lots and common areas in order to preserve and enhance the Property's value and architectural harmony, and to promote and ensure the level of taste, design, quality, and harmony by which the Property is developed and maintained.

4.2. ARCHITECTURAL CONTROL COMMITTEE. The Architectural Control Committee (the "ACC") consists of a minimum of 3 persons but not more than 5 appointed by Declarant during the Development Period. After the Development Period, the ACC consists of 3 persons appointed by the Board, pursuant to the Bylaws, or, at the Board's option, the Board may act as the ACC. If the Board acts as the ACC, all references in the Governing Documents to the ACC are construed to mean the Board. Members of the ACC need not be owners or residents.

4.3. LIMITS ON LIABILITY. The ACC has sole discretion with respect to taste, design, and all standards specified by this Article. The members of the ACC have no liability for the ACC's decisions made in good faith, and which are not arbitrary or capricious. The ACC is not responsible for: (1) errors in or omissions from the plans and specifications submitted to the ACC, (2) supervising construction for the owner's compliance with approved plans and specifications, or (3) the compliance of the owner's plans and specifications with city codes and ordinances, state and federal laws.

4.4. PROHIBITION OF CONSTRUCTION, ALTERATION & IMPROVEMENT. Without the ACC's prior written approval, a person may not construct a dwelling or make an addition, alteration, improvement, installation, modification, or reconstruction of or to the Property. The ACC has the right but not the duty to evaluate every aspect of construction, landscaping, and property use that may adversely affect the general value or appearance of the Property.

4.5. PROCEDURE FOR ACC APPROVAL. To request ACC approval, an owner must make written application and submit 2 identical sets of plans and specifications showing the nature, kind, shape, color, size, materials, and locations of the work for which approval is sought. Final plans and specifications shall be submitted in duplicate by certified mail, return receipt requested, to the Associations' Architectural Control Committee. The plans and specifications shall show the nature, kind, shape, height, materials and location of all landscaping and improvements. The documents shall specify any requested variances from the requirements set forth in this Declaration. The Architectural Control Committee is authorized to request the submission of samples of proposed construction materials and such other information, as they reasonably deem necessary to make their determination. At such time as the plans and specifications meet the approval of the Architectural Control Committee, one complete set of plans and specifications will be retained by the Architectural Control Committee, for up to three (3) years only, and the other complete set of plans shall be marked "Approved," signed by a representative of the Architectural Control Committee and returned to the Lot Owner or his designated representative. If disapproved by the Architectural Control Committee, one set of such plans shall be returned marked "Disapproved" and shall be accompanied by a reasonable statement of



Unofficial Copy

ClibPDF - www.fastio.com

the reasons for disapproval, which statement shall be signed by a representative of the Architectural Control Committee. Any modification of the approved set of plans and specifications must again be submitted to the Architectural Control Committee for its approval. The Architectural Control Committee's approval or disapproval, as required herein, shall be in writing. In no event shall the Architectural Control Committee give verbal approval of any plans.

4.6. DEEMED APPROVAL. If the ACC fails to respond in writing – negatively, affirmatively, or requesting information – within 60 days after the ACC's actual receipt of the owner's application, the owner may submit a second request for processing of its original application. If the board fails to respond within 45 days after the boards actual receipt of the owner's second request, the owner's application is deemed approved. The owner may then proceed with the improvement, provided he adheres to the plans and specifications, which accompanied his application, and provided he initiates and completes the improvement in a timely manner. In exercising deemed approval, the burden is on the owner to document the board's actual receipt of the owner's initial application and second request. A signed certified mail receipt may establish the Architectural Control Committee's receipt of the plans. Any Builder who is constructing residences on multiple Lots shall have the option of submitting a master set of final plans and specifications for all of the residences it intends to construct within the Property to the Architectural Control Committee in accordance with the provisions of this paragraph. Once the master set of plans have been approved, the Builder shall be allowed to construct residences in accordance with such approved plans and no further submittals shall be required unless material deviations have been made to such approved plans.

4.7. BUILDING PERMIT. If the application is for work that requires a building permit from the city, the ACC's approval is conditioned on the city's issuance of the appropriate permit. The ACC's approval of plans and specifications does not mean that they comply with the city's requirements. Alternatively, approval by the city does not ensure ACC approval.

4.8. ACC GUIDELINES. The Association may publish architectural restrictions, guidelines, and standards developed by the ACC, subject to revision from time to time including revisions to reflect changes in technology, style, and taste. The Association may publish such documents, on its own initiative, but shall not be required to do so. Such publications are considered *advisory* publications for the ACC, but shall not be interpreted as final, or as the ultimate authority as it is the Declarant's intention that the ACC have discretionary authority when need be. Clearly, any publications cited, used or followed from time to time are not to be regarded as limiting the authority and/or the discretion of the ACC. Furthermore, in light of the ACC does discretion to deviate from such publications as need be, publications will not be considered public property or subject to review by any one other than those comprise the ACC. The Association, acting through the ACC, has the right to establish and enforce architectural restrictions, guidelines, and standards relating to every aspect of proposed or existing improvements on a lot, including but not limited to dwellings, fences, and landscaping, and further including replacements or modifications of original construction or installation.

## ARTICLE 5
## RESIDENTIAL CONSTRUCTION AND PERMITTED USES

Unofficial Copy



ClibPDF - www.fastio.com

5.1. COMPLIANCE REQUIREMENTS. All improvements on a lot must (1) comply with any applicable city ordinances and codes, (2) have a building permit issued by the city, if the type of improvements requires a permit, and (3) have the ACC's prior written approval. These 3 requirements are independent – one does not ensure or eliminate the need for another. The ACC's prior written approval is a mandatory requirement for any variance and/or improvement constructed on every lot.

5.2. VARIANCE. The use of the Property is subject to the restrictions contained in this Article, and subject to rules adopted pursuant to this Article. The board or the ACC, as the case may be, may grant a variance or waiver of a restriction or rule on a case-by-case basis, and may limit or condition its grant.

5.3. HOUSES. The principle improvement on a lot must be one detached single-family dwelling. The dwelling size, setbacks, and exterior materials must comply with the applicable ordinances and with any higher standards established by the ACC.

5.4 MINIMUM FLOOR AREA. The total air-conditioned living area of the main residential structure constructed on each Lot, as measured to the outside of exterior walls but exclusive of open porches, garages, patios and detached accessory buildings, shall be as follows:

5.4.1. The minimum area of the main dwelling shall be one thousand two hundred (1,200) square feet, exclusive of garages, breezeways and porticos.

5.5. BUILDING MATERIALS. The total exterior wall area (as used herein the term "total exterior wall area" shall exclude windows and doors) of each building constructed or placed on a Lot shall be not less than seventy five percent (75%) brick, brick veneer, stone, stone veneer on the first level, or other material approved by the Declarant. The second level exterior wall area shall be constructed of masonry or masonry product, or other material approved by the Declarant. Roofing shall be of a substance acceptable to the City, shall be covered by a manufacturer's warranty of at least 20 (twenty) years and shall have a minimum six (6') to twelve-foot (12') roof pitch on the major portions of the building. (6/12 MINIMUM ROOF PITCH)

5.6. GARAGES. Each residence shall have a garage suitable for parking a minimum of two (2) standard size automobiles, which garage conforms in design and materials with the main structure. All entries are permitted. All driveways shall be surfaced with concrete.

5.7. NEW CONSTRUCTION. Dwellings must be constructed on the lot. A dwelling or addition constructed elsewhere may not be moved onto a lot. The construction of a dwelling must be started promptly after the ACC approves the dwelling's plans and specification. At the start of construction – but not before – building material to be used in the construction may be stored on the lot. Once started, the dwelling and all improvements on the lot must be completed with due diligence.

5.8. ACCESSORIES. Installation of all exterior items and surfaces, including address numbers, decorative hardware, fencing , walls, , external ornamentation, lights fixtures, and exterior paint and stain, is subject to the ACC's prior approval, including approval of design, color, materials, and location.



Unofficial Copy

ClibPDF - www.fastio.com

5.9. FENCES & WALLS. This Section is subject to the ACC's right to adopt additional or different specifications for construction or reconstruction of fences. Any fence or wall must be constructed of masonry, brick, wood or other material approved by the Association. No chain link fences are permitted. Any fence or portion thereof that faces a public street shall be so constructed so that all structural members and posts will be on the side of the fence away from the street so that they are not visible from any public right-of-way. No portion of any fence shall extend more than six feet and one-half (6-1/2') in height without prior approval of the ACC.

5.9.1 Those lots bordering the Common Area's must have five foot (5') wrought Iron fences consistent with approved design unless otherwise approved by ACC.

5.10. RETAINING WALLS. Retaining walls must be constructed entirely with ACC-approved materials, however railroad ties may not be used for a retaining wall visible from a street. Fences may not be constructed between a dwelling's front building line and the street, except for model home lots or approved by declarant. All fence design, location, height , material and color must be approved, in writing, by the ACC prior to installation.

5.11. UTILITIES. All utility lines and equipment must be located underground, except for: (1) elevated or surface lines or equipment required by a public utility or the city; (2) elevated or surface lines or equipment installed by Declarant; and (3) surface equipment necessary to maintain, operate, or read underground facilities, such as meters, risers, service pedestals, and transformers. The ACC may require that utility meters, risers, pedestals, and transformers be visually screened form the street and neighboring lots. Each lot shall be connected to and shall use water and sanitary sewage systems operated by Aqua Texas. Individual water supply and sewage disposal systems are not permitted.
Electric service to the Lots is provided by Tri-County Electric Cooperative. Phone service to the Lots is provided by Southwestern Bell.

5.12. LOT MAINTENANCE BY OWNERS. Both the lot and the dwelling must be maintained in a manner so as not to be unsightly when viewed from the street or neighboring lots. The ACC is the arbitrator of acceptable appearance standards.

5.13. ASSOCIATION'S RIGHT TO PROMULGATE RULES. The Association, acting through its Board, is granted the right to adopt, amend, repeal, and enforce reasonable Rules and penalties for infractions thereof, regarding the occupancy, use, disposition, maintenance, appearance, and enjoyment of the Property. In addition to the restrictions contained in this Article, each lot is owned and occupied subject to the right of the Board to establish Rules, and penalties for infractions thereof, governing:

a. Use of the common areas.
b. Hazardous, illegal, or annoying materials or activities on the Property.
c. The use of Property-wide services provided through the Association.
d. The consumption of utilities billed to the Association.
e. The use, maintenance, and appearance of exteriors of dwellings and lots.
f. The occupancy and leasing of dwellings.
g. Animals.
h. Vehicles.



Unofficial Copy

ClibPDF - www.fastio.com

i. Disposition of trash and control of vermin, termites, and pests.
j. Anything that interferes with maintenance of the Property, operation of the Association, administration of the Governing Documents, or the quality of life for residents.

5.13. ACCESSORY STRUCTURES. Without the prior written approval of the ACC, accessory structures – such as dog houses, gazebos, storage buildings, playhouses, and greenhouses – are prohibited (not allowed) if (1) they exceed the height of a fence, (2) are visible from a street or common area, or (3) are visible by a person standing on the surface of an adjoining lot. Accessory structures may not be located in front yards or in unfenced portions of side yards facing streets. If an accessory structure is installed in violation of this Section, the ACC reserves the right to determine that the accessory structure is unattractive or inappropriate or otherwise unsuitable for the Property, and may require the owner to screen it or to remove it.

| GET ACC APPROVAL BEFORE YOU SHOP FOR A STORAGE SHED |
|---|

5.14. ANIMALS. No animals or livestock shall be raised, bred or kept on the Property except that dogs, cats or other household pets may be kept for the purpose of providing companionship for the private family. Animals are not to be raised, bred or kept for commercial purposes or for food. It is the purpose of these provisions to restrict the use of the Property so that no person shall quarter on the premises cows, horses, hogs, pigs (including pot-bellied pigs), guinea fowls, ducks, chickens, turkeys, skunks or any other animals that may interfere with the quietude, health or safety of the Community. Pets must be restrained or confined by their Owner to the back yard of the applicable Lot, inside a fenced area or within the residence erected thereon, provided any such pets may be walked only if a leash restrains such pet. It is the Owner's responsibility to keep the front of their Lot clean and free of pet debris. All animals must be properly tagged for identification. Unless the Rules provide otherwise, the subsections of this Article shall govern animals at the Property.

5.14.1. Disturbance. Pets must be kept in a manner that does not disturb the peaceful enjoyment of residents of other lots.

5.14.2. Waste Removal. Unless the Rules provide otherwise, a resident must prevent his pet from relieving itself on the common area or the lot of another owner. Resident is responsible for the removal of his pet's wastes from the Property.

5.14.3. Liability. An owner is responsible for any property damage, injury, or disturbance caused or inflicted by an animal kept on the lot. The owner of a lot on which an animal is kept is deemed to indemnify and to hold harmless the Board, the Declarant, the Builder(s) and the Association, from any loss, claim, or liability resulting from any action of the animal or arising by reason of keeping the animal on the Property.

5.15. DRAINAGE. No person may interfere with the established drainage pattern over any part of the Property unless the Board has approved an adequate alternative provision for proper drainage. Further, each owner covenants to honor any drainage easement affecting his lot, as shown on the plat or as required by any master drainage plan enacted by the city.



Unofficial Copy

ClibPDF - www.fastio.com

Specifically, each owner agrees (1) to maintain the integrity of the drainage design of his lot by not filling or altering drainage swales that are constructed on the lot as required by the city or by the ACC; (2) to not construct fences that impede or deflect the flow of water across his lot; (3) to not impede or deflect the flow of water in drainage areas by placing objects or by planting excessive landscaping in those areas; and (4) to conform the design and construction of sidewalks, driveways, and foundations in drainage areas to the city's drainage requirements.

5.16. DRILLING AND MINING OPERATIONS. All oil drilling, water drilling or mineral development operations, oil refining, quarrying or mining operations of any kind shall be conducted in compliance with all applicable laws, including, but not limited to, regulations by the Department of Housing and Urban Development, the Federal Housing Authority, Veterans Administration and any other applicable agency, department, commission, board, bureau, or instrumentality of any governmental authority of the United States, the State of Texas, the County of Wise, the City and any other local authority. Furthermore, the mineral owners, or their heirs, successors and/or assigns, may develop or produce the oil, gas and other minerals in and under the Properties by pooling or by directional drilling under the Properties from the well sites located on land other than the Properties.

Purchaser has been informed of the existence of Oil, Gas and Mineral Leases between the owners of mineral interests beneath the land where the Chisholm Springs Subdivision is located and Mitchell Energy Corporation, recorded in Volume 779, Page 115, Volume 785, Page 389, and Volume 785, Page 408, respectively, of the Real Records of Wise County, Texas. Under the terms of an Easement and Limited Surface Waiver, recorded in Volume 1024, Page1, official records of Wise County, Texas, on February 22, 2001, Mitchell Energy Corporation was granted the exclusive and free right to use all or any portion of the surface of two five-acre drill sites, neither of these drill sites are situated on the Property. In addition, Mitchell Energy Corporation has been granted the free but non-exclusive right to use said two fifty foot easements.

5.17. DRIVEWAYS. The driveway portion of a lot may not be used for any purpose that interferes with its ongoing use as a route of vehicular access to the garage. Without the board's prior approval, a driveway may not be used: (1) for storage purposes, including storage of boats, trailers, and inoperable vehicles; or (2) for repair or restoration of vehicles other than routine short-term maintenance.

5.18. BASKETBALL GOALS. Without the ACC's prior written approval, basketball goals and other recreational or supporting equipment may not be used, attached, mounted, or installed in a front yard, on a front driveway, in an unfenced portion of a side yard, or on the street side exterior portion of a dwelling. If the ACC grants approval for such equipment, the approval may be revoked if the equipment is not maintained, or if it becomes unsightly.

5.19. LANDSCAPING. Every front yard shall be sodded upon completion and prior to customer taking occupancy of home. "Completion" as it is used in this Section 5.18 shall be defined as the date upon which a structure/house is connected to Aqua Texas' sewer and or water service.

5.20. MAILBOXES. All mailboxes shall be installed according to a uniform set of detail specifications. Notwithstanding all mailboxes must be exclusively constructed with use



ClibPDF - www.fastio.com

Unofficial Copy

of the material as may be required by the applicable postal authority and approved by the ACC.

5.21. LEASING OF HOMES. An owner may lease the dwelling on his lot, subject to the Governing Documents (whether or not a written lease sets forth provisions for same). An owner is responsible for providing his tenant with copies of the Governing Documents and notifying him of changes thereto. An Owner is also responsible for the tenant and/or his invitees', failure to comply with the Governing Documents and any and all federal, state or local laws and regulations.

5.22. NOISE & ODOR. A resident must exercise reasonable care to avoid making or permitting to be made loud, disturbing, or objectionable noises or noxious odors that are likely to disturb or annoy residents of neighboring lots.

5.23. OCCUPANCY. Other than the completed principle dwelling, no thing or structure on a lot may be occupied as a residence at any time by any person. This provision applies, without limitation, to the garage, mobile homes, campers, and storage sheds.

5.24. RESIDENTIAL USE. The use of a lot is limited exclusively to residential purposes or any other use permitted by this Declaration. This residential restriction does not, however, prohibit a resident from using a dwelling for personal business or professional pursuits provided that: (1) the uses are incidental to the use of the dwelling as a residence; (2) the uses conform to applicable governmental ordinances; (3) there is no external evidence of the uses; (4) the uses do not entail visits to the lot by employees or the public in quantities that materially increase the number of vehicles parked on the street; and (5) the uses do not interfere with residents' use and enjoyment of neighboring lots.

5.25. TELEVISION AND ANTENNAS. Each resident of the Property will avoid doing or permitting anything to be done that may unreasonably interfere with the television, radio, telephonic, electronic, microwave, cable, or satellite reception on the Property. Antennas, satellite or microwave dishes, and receiving or transmitting towers that are visible from a street or from another lot are prohibited within the Property, and shall be located inside the structure (such as in an attic or garage). The Owner of each Lot and/or residence hereby waives all rights, federal or other, for operating or maintaining ham radio antennas within the Property unless the ham radio antenna is not visible from the street or another lot.

5.24.1 Limited Exceptions. The following are the only areas for attachment and/or mounting that will be allowed as exceptions to the foregoing language in this section

a. Attachment, location or mounting in a fenced yard so long as it is not visible from a street or from another lot;

b. Attached to or mounted on the rear wall of a structure below the eaves, on the residence or in a tree, provided it is mounted in the most inconspicuous location when viewed from the front of the residence.

Unofficial Copy



ClibPDF - www.fastio.com

In the event a dispute arises with regard to the determination of the "most inconspicuous location" of any such mounted satellite dish, a majority of the Board of Directors shall determine the most inconspicuous location and such determination shall be final. No satellite dish in excess of twenty-five inches (25") shall be permitted on any Lot.

5.25. TEMPORARY STRUCTURES. Improvements or structures of a temporary or mobile nature, such as tents, portable sheds, and mobile homes, may not be placed on a lot if visible from a street or another lot. However, an owner or owner's contractor may maintain a temporary structure (such as a portable toilet or construction trailer) on the lot during construction of the dwelling.

5.26. VEHICLES. All vehicles on the Property, whether owned or operated by the residents or their families and guests, are subject to this Section and Rules adopted by the board. The board may adopt, amend, and repeal rules regulating the types, sizes, numbers, conditions, uses, appearances, and locations of vehicles on the Property. Without prior written board approval, the following types of vehicles and vehicular equipment – mobile or otherwise – may not be kept, parked, or stored anywhere on the Property if the vehicle is visible from a street or from another lot: mobile homes, motor homes, buses, trailers, boats, aircraft, inoperable vehicles, commercial truck cabs, trucks with tonnage over one ton, vehicles with advertising signage, vehicles which are not customary personal passenger vehicles, and any vehicle which the board deems to be a nuisance, unsightly, or inappropriate. This restriction includes overnight parking on streets, driveways, and alleys. This restriction does not apply to vehicles and equipment temporarily on the Property in connection with the construction or maintenance of a dwelling. Vehicles that transport inflammatory, bio-hazardous or explosive cargo are prohibited from the Property at all times. The Association may effect the removal of any vehicle in violation of this Section or the Rules without liability to the owner or operator of the vehicle. All vehicles parked on any Lot within the view of public shall be in good operating condition, shall have current license plates, inspection stickers and registrations and shall be in daily use as motor vehicles on the streets and highways of the State of Texas.

5.27. CONSTRUCTION RESTRICTIONS AND PROHIBITED USES. The ACC's prior written approval for any variance and/or improvements constructed on every lot must have the characteristics described herein, which may be treated as the minimum requirements for improving and using a lot. The ACC and the Board may promulgate additional rules and restrictions, as well as interpretations, additions, and specifications of the restrictions contained in this Article.

**An owner should review the Association's architectural restrictions before planning improvements, repairs, renovations or replacements to his lot and/or dwelling.**

The following restrictions and prohibited uses shall be strictly followed and enforced:

5.27.1 No temporary dwelling, shop, trailer or mobile home of any kind or any improvement of a temporary character (except children's playhouses, dog houses, greenhouses, gazebos and buildings for storage of lawn maintenance equipment) shall be permitted on any Lot except that the Builder or contractor may have temporary improvements (such as a sales office and/or construction trailer) on a given Lot during construction of the residence on that Lot or on a different Lot as



Unofficial Copy

ClibPDF - www.fastio.com

agreed to between the Builder or contractor and the Declarant. No building material of any kind or character shall be placed or stored upon the Property until the Owner thereof is ready to commence construction of improvements, and then such material shall be placed within the property lines of the Lot upon which the improvements are to be erected.

5.27.2 No Lot or other area on the Property shall be used as a dumping ground for rubbish or a site for the accumulation of unsightly materials of any kind, including, without limitation, broken or rusty equipment, disassembled or inoperative cars, other vehicles or discarded appliances, furniture and/or grass clippings. Trash, garbage or other waste shall not be kept except in sanitary containers. All incinerators or other equipment for the storage or other disposal of such material shall be kept in clean and sanitary condition. Materials incident to construction of improvements may be stored on Lots during construction so long as construction progresses without undue delay.

5.27.3 No air-conditioning apparatus shall be installed in front of a residence . No air-conditioning apparatus shall be attached to any front wall or window of a residence, and no evaporative cooler shall be installed on the front wall or window of a residence. All air-conditioning equipment must be installed in the rear yard or on the side yard. Solar panels installed on the residence or Lot is allowed only if not visible from the street or any other Lot.

5.27.4 No Lot or improvement thereon shall be used for commercial or manufacturing purposes of any kind other than a small home office. No noxious or offensive activity shall be undertaken on the Property, nor shall anything be done which is or may become an annoyance or nuisance to the neighborhood. Nothing in this subparagraph shall prohibit a Builder's use of a residence as a sales office until such Builder's last residence on the Property is sold. Nothing in this subparagraph shall prohibit an Owner's use of a residence for quiet, inoffensive activities such as a small home office, tutoring or giving lessons such as art or music, so long as such activities do not materially increase the number of cars parked on the street or interfere with the other Owners' reasonable use and enjoyment of their Lots and residences.

5.27.5 No fence, wall, hedge or shrub planting which obstructs sight lines at elevations between three feet (3') and six feet (6') above the roadway shall be placed or permitted to remain on any corner Lot within the triangular area formed by the street right-of-way lines and a line connecting them at points ten feet (10') from the intersection of the street right-of-way lines, or, in the case of a rounded property corner, from the intersection of the street right-of-way lines as extended. The same sight-line limitations shall apply on any Lot within ten (10) feet from the intersection of a street right-of-way line with the edge of a private driveway or alley pavement. This restriction shall not apply to model home lots. No tree shall be permitted to remain within such distance of such intersections unless the foliage line is maintained at sufficient height to prevent obstruction of such sight lines.

5.27.6 No garage, garage house, or structure of a temporary character, such as a trailer, tent, shack, barn or other out-building shall be occupied by any Owner, tenant or



Unofficial Copy

ClibPDF - www.fastio.com

other person prior to the erection of a residence or used on the Property at any time as a dwelling house; provided, however, that any Builder may maintain and occupy model homes, sales offices and construction trailers during the construction period and sales periods.

5.27.7 Except for children's playhouses, dog houses, greenhouses, gazebos and buildings for storage of lawn maintenance equipment, no building previously constructed elsewhere shall be moved onto any Lot, it being the intention that only new construction be placed and erected thereon.

5.27.8 No sign of any kind shall be displayed to the public view on any Lot, except one (1) professional security service sign of not more than one square foot, one (1) sign of not more than five square feet advertising the property for sale and one open house, political signs during election periods only as permitted by the City, or signs used by a Builder to advertise the Property during the construction and sales period, each of which shall, in any event, comply with all statues, laws or ordinances governing same. The Board of Directors or its agents shall have the right to remove any sign, billboard or other advertising structure that does not comply with the above, and in so doing shall not be subject to any liability for trespass or otherwise in connection with such removal.

5.27.9 The drying of clothes in full public view is prohibited. The Owners and occupants of any Lots at the intersections of streets or adjacent to parks, playgrounds or other facilities where the rear yard is visible to full public view shall construct a fence or other suitable enclosure to screen from public view the equipment and other items which are incident to normal residences, such as clothes drying equipment, yard equipment, wood piles, storage piles and the like.

5.27.10 No Owner shall perform, fail to perform or permit anything to be done or not done on his Lot, which would violate any laws, statutes, ordinances or regulations of any kind or character.

5.27.11 No lot or common area may be used in any way that: (1) may reasonably be considered a public nuisance and/or a disturbance of the peace; (2) may be calculated to reduce the desirability of the Property as a residential neighborhood; (3) may endanger the health or safety of residents of other lots; (4) may result in the cancellation of insurance on the Property; or (5) violates any law. The Board has the sole authority to determine what constitutes an annoyance.

## ARTICLE 6
## ASSOCIATION AND MEMBERSHIP RIGHTS

6.1. THE BOARD. Unless the Governing Documents expressly reserve a right, action, or decision to the owners, Declarant, or another party, the board acts in all instances on behalf of the Association. Unless the context indicates otherwise, references in the Governing Documents to the "Association" may be construed to mean "the Association acting through its board of directors."

Unofficial Copy



ClibPDF - www.fastio.com

6.2. THE ASSOCIATION. The duties and powers of the Association are those set forth in the Governing Documents, together with the general and implied powers of a property owners association and a nonprofit corporation organized under the law of the State of Texas. Generally, the Association may do any and all things that are lawful and necessary, proper, or desirable in operating for the peace, health, comfort, and general benefit of its members, subject only to the limitations on the exercise of such powers as stated in the Governing Documents. The Association comes into existence on the earlier of (1) issuance of its corporate charter of (2) the initial levy of assessments against the lots and owners. The Association will continue to exist at least as long as the Declaration is effective against the Property, regardless of whether its corporate charter lapses from time to time.

**EVERY OWNER OF A CHISHOLM SPRINGS LOT AUTOMATICALLY JOINS A MANDATORY MEMBERSHIP ASSOCIATION.**

6.3. GOVERNANCE. The Association will be governed by a board of elected.[1] Directors. Unless the Association's Bylaws or Articles of Incorporation provide otherwise, the Board will consist of at least 3 persons elected at the annual meeting of the Association, or at a special meeting called for that purpose. The Association will be administered in accordance with the Bylaws. Unless the Governing Documents provide otherwise, any action requiring approval of the members may be approved in writing by owners of at least a majority of all lots, or at a meeting by owners of at least a majority of the lots that are represented at the meeting.

6.4. MEMBERSHIP. Each owner is a member of the Association, ownership of a lot being the sole qualification for membership. Membership is appurtenant to and may not be separated from ownership of the lot. The board may require satisfactory evidence of transfer of ownership before a purported owner is entitled to vote at meetings of the Association. If a lot is owned by more than one person or entity, each co-owner is a member of the Association and may exercise the membership rights appurtenant to the lot. A member who sells his lot under a contract for deed may delegate his membership rights to the contract purchaser, provided a written assignment is delivered to the board. However, the contract seller remains liable for all assessments attributable to his lot until fee title to the lot is transferred.

6.5. CLASSES OF MEMBERSHIP AND VOTING. One vote is appurtenant to each lot. The total number of votes equals the total number of lots in the Property. Each vote is uniform and equal to the vote appurtenant to every other lot, except during the Development Period as permitted in "EXHIBIT B". Cumulative voting is not allowed. Votes may be cast by written proxy, according to the requirements of the Association's bylaws.

The Association shall have two (2) classes of voting membership:

6.5.1. Class A. Class A Members shall be all Members with the exception of Declarant. Class A Members shall be entitled to one (1) vote for each Lot in

[1] Election by the members is the ultimate goal of the Declarant. Notwithstanding, during the Development Period and/or Declarant Control Period, the Board of Directors may be appointed/elected as set forth in the provisions of this Declaration, which cover and stipulate the rights of the Declarant during the respective time periods.



Unofficial Copy
ClibPDF - www.fastio.com

which they hold the interest required for membership; provided, however, that in the event that more than one (1) person holds such interest or interests in any Lot, even though all such persons shall be Members, there shall be only one (1) vote for such Lot, which shall be exercised as they, among themselves, determine (but in no event shall more than one (1) vote be cast with respect to any such Lot).

6.5.2. Class B. The Class B Member(s) shall be the Declarant. Until such time as the Declarant has sold all of the Lots in the Property, the Class B Member shall have the sole right to elect the Board of Directors of the Association. Control of the Association shall only be vested in the Owners after completion of transfer to Class A Members of title to all of the Lots in the Property. The Declarant shall have four (4) votes for each Lot it owns.

6.6. VOTING BY CO-OWNERS. The one vote appurtenant to a lot is not divisible. If only one of the multiple co-owners of a lot is present at a meeting of the Association, that person may cast the vote allocated to the lot. If more than one of the co-owners is present, the lot's one vote may be cast with the co-owners' unanimous agreement. Co-owners are in unanimous agreement if one of the co-owners casts the vote by ballot or proxy by the other co-owners. If the person presiding over the meeting or balloting receives evidence that the co-owners disagree on how the one appurtenant vote will be cast, the vote will not be counted.

6.7. BOOKS & RECORDS. The Association will maintain copies of the Governing Documents and the Association's books, records, and financial statements. Books and records of the Association will be made available for inspection and copying pursuant to Article 1396-2.23-B. of the Texas Nonprofit Corporation Act.

6.8. INDEMNIFICATION. The Association indemnifies every officer, director, and committee member (for purposes of the Section, "Leaders") against expenses, including attorney's fees, reasonably incurred by or imposed on the Leader in connection with an action, suit, or proceeding to which the Leader is a party by reason of being or having been a Leader. A Leader is not liable for a mistake of judgment, negligent or otherwise. This right to indemnification does not exclude any other rights to which present or former Leaders may be entitled. The Association may maintain general liability and directors and officer's liability insurance to fund this obligation.

6.9. OBLIGATIONS OF OWNERS. Without limiting the obligations of owners under the Governing Documents, each owner has the following obligations:

6.9.1. Information. Within 30 days after acquiring an interest in a lot, within 30 days after the owner has notice of a change in any information required by this Subsection, and on request by the Association from time to time, an owner will provide the Association with the following information: (1) a copy of the recorded deed by which owner has title to the lot; (2) the owner's address and phone number. (3) any mortgagee's name, address, and loan number; (4) the name, address, and phone number of owner's managing agent, if any.

6.9.2. Pay Assessments. Each owner will pay assessments properly levied by the Association against the owner or his lot, and will pay regular assessments without demand by the association.



Unofficial Copy
ClibPDF - www.fastio.com

6.9.3. Comply. Each owner will comply with the Governing Documents as amended or restated from time to time.

6.9.4. Reimburse. Each owner will pay for damage to the Property caused by the negligence or willful misconduct of the owner, a resident of the owner's lot, or the owner or resident's family, guest, employees, contractors, agents, or invitees.

6.9.5. Liability. Each owner is liable to the Association for violations of the Governing Documents by the owner, a resident of the owner's lot, or the owner or resident's family, guest, employees, agents of invitees, and for cost incurred by the Association to obtain compliance, including attorney's fees whether or not suit is filed.

6.10. TRANSFER-RELATED FEES. A number of independent fees may be charged in relation to the transfer of title to a lot, including but not limited to fees for resale certificates, estoppel certificates, copies of the Governing Documents, compliance inspections, ownership record changes, and priority processing, provided the fees are customary in amount, kind, and number for the local marketplace. Transfer-related fees are not refundable and may not be regarded as a prepayment of or credit against regular or special assessments. The above stated transfer-related fees are set at One Hundred Fifty dollars $150. Transfer-related fees do not apply to the following transfers unless a party to the transfer request the corresponding documentation: (1) foreclosure of a deed of trust lien, tax lien, or the Association's assessment lien; (2) transfer to, from, or by the Association; (3) voluntary transfer by an owner to one or more co-owners, or to the owner's spouse, child, or parent. Transfer-related fees may be charged by the Association or by the Association's managing agent, provided there is no duplication of fees. Transfer-related fees charged by or paid to a managing agent must have the prior written approval of the Association, are not subject to the Association's assessment lien, and are not payable by the Association. This Section does not obligate the board or the managing agent to levy transfer-related fees.

## ARTICLE 7
## COVENANT FOR ASSESSMENTS

7.1. PURPOSES OF ASSESSMENTS. The association will use assessments for the general purposes of preserving and enhancing the property, and for the common benefit of owners and residents, including but not limited to maintenance of real and personal property, management and operation of the Association, and any expense reasonably related to the purposes for which the Property was developed. If made in good faith, the board's decision with respect to the use of assessments is final.

7.2. PERSONAL OBLIGATION. An owner is obligated to pay assessments levied by the board against the owner or his lot. An owner makes payment to the Association at its principal office or at any other place the board directs. Payments must be in full regardless of whether an owner has a dispute with the Board, ACC or with the Association, another owner, or any other person or entity regarding any matter to which this Declaration pertains. No owner may exempt himself from his assessment liability by waiver of the use or enjoyment of the common area or by abandonment of his lot. An owner's obligation is not subject to offset by the owner, nor is it contingent on the



ClibPDF - www.fastio.com

Unofficial Copy

Association's performance of the Association's duties. Payment of assessment is both a continuing affirmative covenant personal to the owner and a continuing covenant running with the lot.

IF YOU OWN A CHISHOLM SPRINGS LOT, YOU MUST PAY ASSESSMENTS TO THE ASSOCIATION.

7.3. CONTROL FOR ASSESSMENT INCREASES. Until January 1 of the year immediately following the conveyance of the first Lot to any Owner, the maximum monthly assessment shall be Thirty Five dollars and No/100 Dollars ($35.00) per Lot per month, paid quarterly. Thereafter the Board may increase the Maintenance Assessment annually to meet the anticipated needs of the appropriate budget, but the Maintenance Assessment may not be increased in any year by an amount in excess of twenty percent (20%) above the previous year's Maintenance Assessment, unless such increase is approved by a majority vote of those members of the Association present at a meeting, in person or by proxy, where a quorum exists.

7.4. TYPE OF ASSESSMENTS. There are 3 types of assessments: Regular, Special, and Individual.

7.4.1. Regular Assessments. Regular assessments are based on the annual budget. Each lot is liable for its equal share of the annual budget. If the board does not approve an annual budget or fails to determine new regular assessments for any year, or delays in doing so, owners will continue to pay the regular assessments as last determined. Regular assessments are used for common expenses related to the reoccurring, periodic, and anticipated responsibilities of the Association, including but not limited to:

a. Maintenance, repair, and replacement, as necessary, of the common area.
b. Utilities billed to the Association.
c. Services billed to the Association and serving all lots.
d. Taxes on property owned by the Association and the Association's income taxes.
e. Management, legal, accounting, auditing, and professional fees for services to the Association.
f. Costs of operating the Association, such as telephone, postage, office supplies, printing, meeting expenses, and educational opportunities of benefit to the Association.
g. Premiums and deductibles on insurance policies and bonds deemed by the board to be necessary or desirable for the benefit of the Association, including fidelity bonds and directors and officers liability insurance.
h. Contributions to the reserve funds.
i. Any other expense which the Association is required by law or the Governing Documents to pay, or which in the opinion of the board is necessary or proper for the operation and maintenance of the Property or for enforcement of the Governing Documents.

7.4.2. Special Assessments. In addition to regular assessments, and subject to the owners' control for assessment increases, the board may levy one or more special



Unofficial Copy
ClibPDF - www.fastio.com

assessments against all lots for the purpose of defraying, in whole or in part, common expenses not anticipated by the annual budget or reserve funds. Special assessments do not require the approval of the owners, except that special assessments for the purposes provided hereafter must be approved by owners of least a majority vote of those members of the Association present at a meeting, in person or by proxy, at which a quorum exists. At least fifteen (15) days prior to any meeting of the Association called to consider any Special Assessment, the Board shall notify each Owner thereof by written notice specifying the total amount of the Special Assessment required, the amount thereof imposed on each Lot (which shall be uniform), the purpose for such Special Assessment, and the time and method of payment thereof. Special Assessments for the following purposes shall require approval under the terms set forth in this provision:

a. Acquisition of real property, other than the purchase of a lot at the sale foreclosing the Association's lien against the lot;
b. Construction of additional improvements within the Property;
c. Any expenditure that may reasonably be expected to significantly increase the Association's responsibility and financial obligation for operations, insurance, maintenance, repairs, or replacement.

7.4.3. Individual Assessments. In addition to regular and special assessments, the Board may levy an individual assessment against a lot and its owner. Individual assessments may include, but are not limited to: interest, late charges, and collection costs on delinquent assessments; reimbursements for costs incurred in bringing an owner or his lot into compliance with the Governing Documents; fines for violations of the Governing Documents; insurance deductibles; transfer-related fees and resale certificate fees; fees for estoppel letters and project documents; reimbursement for damage or waste caused by willful or negligent acts; common expenses that benefit fewer than all of the lots, which may be assessed according to benefit received; fees or charges levied against the Association on a per-lot basis; and "pass through" expenses for services to lots provided through the Association and which are equitably paid by each lot according to benefit received.

7.5. BASIS & RATE OF ASSESSMENTS. The share of liability for common expenses allocated to each lot is uniform for all lots, regardless of a lot's location or the value and size of the lot or dwelling, but subject to lower rates of assessment for vacant lots. The rates of assessment area as follows:

7.5.1. Improved Lot. A lot that has been improved with a dwelling for which the house/structure has been connected to Aqua Texas' water and or sewer service will at all times thereafter be assessed at the full rate.

7.5.2. Lots Owned by Declarant. Notwithstanding preceding subsection, Declarant shall not be liable for Assessments for any Lots that it owns. Declarant may, but shall have no obligation to, subsidize the Association from time to time. In the event Declarant decides to subsidize the Association and any shortfall in the operating budget of the Association is due in part to the failure of the Association to collect delinquent Assessments, then the Association shall immediately and vigorously pursue collection of such delinquent Assessments through



Unofficial Copy

ClibPDF - www.fastio.com

foreclosure, if necessary, and shall reimburse the Declarant the amounts, if any, so collected during the Development Period. Declarant is subject to the assessment exemption in "EXHIBIT B".

7.6. ANNUAL BUDGET. The board will prepare and approve an estimated annual budget for each fiscal year. The budget will take into account the estimated income and expenses for the year, contributions to reserve funds, and a projection for uncollected receivables.

7.7. DUE DATE. The board may levy regular assessments on any periodic basis – annually, semi-annually, quarterly, or monthly. Regular assessments are due on the first day of the period for which levied. Special and individual assessments are due on the date stated in the notice of assessment or, if no date is stated, within 10 days after notice of the assessment is given. Assessments are delinquent if not received by the Association on or before the due date.

7.8. ASSOCIATION'S RIGHT TO BORROW MONEY. The Association is granted the right to borrow money, subject to the consent of owners of at least a majority of lots and the ability of the Association to repay the borrowed funds from assessments. To assist its ability to borrow, the Association is granted the right to encumber, mortgage, pledge, or deed in trust any of its real or personal property, and the right to assign its right to future income, as security for money borrowed or debts incurred, provided that the rights of the lender in the pledged property are subordinate and inferior to the rights of the owners hereunder.

7.9. ASSESSMENT LIEN. Each owner, by accepting an interest in or title to a lot, whether or not it is so expressed in the instrument of conveyance, covenants and agrees to pay assessments to the Association. Each assessment is a charge on the lot and is secured by a continuing lien on the lot. Each owner, and each prospective owner is placed on notice that his title may be subject to the continuing lien for assessments attributable to a period prior to the date he purchased his lot.

7.9.1. Superiority of Assessment Lien. The assessment lien is superior to all other liens and encumbrances on a lot, except only for (1) real property taxes and assessments levied by governmental and taxing authorities, (2) a deed of trust or vendor's lien recorded before this Declaration, (3) a recorded deed of trust lien securing a loan for construction of the original dwelling, and (4) a first or senior purchase money vendor's lien or deed of trust lien recorded before the date on which the delinquent assessment became due.

7.9.2. Effect of Foreclosure. Foreclosure of a superior lien extinguishes the Association's claim against the lot for unpaid assessments that became due before the sale, but does not extinguish the Association's claim against the former owner. The purchaser at the foreclosure sale is liable for assessments coming due from and after the date of the sale, and for the owner's pro rata shares of the pre-foreclosure deficiency as an Association expense.

7.9.3. Perfection of Lien. The Association's lien for assessments is created by recordation of this Declaration, which constitutes record notice and perfection of the lien. No other recordation of a lien or notice of lien is required. However,



ClibPDF - www.fastio.com
Unofficial Copy

the Association, at its option, may cause a notice of the lien to be recorded in the court's real property records.

7.9.4. Power of Sale. By accepting an interest in or title to a lot, each owner grants to the Association a private power of nonjudicial sale in connection with the Association's assessment lien. The board may appoint, from time to time, any person, including an officer, agent, trustee, substitute trustee, or attorney, to exercise the Association's lien rights on behalf of the Association, including the power of sale. The appointment must be in writing and may be in the form of a resolution recorded in the minutes of a board meeting.

7.9.5. Foreclosure of Lien. The assessment lien may be enforced by judicial or nonjudicial foreclosure. A nonjudicial foreclosure must be conducted in accordance with the provisions applicable to the exercise of powers of sale as set forth in Section 51.002 of the Texas Property Code, or in any manner permitted by law. In any foreclosure, the owner is required to pay the Association's costs and expenses for the proceedings, including reasonable attorneys' fees. The Association has the power to bid on the lot at foreclosure sale and to acquire, hold, lease, mortgage, and convey same.

7.10. LIMITATIONS OF INTEREST. The Association, and its officers, directors, managers, and attorneys, intend to conform strictly to the applicable usury laws of the State of Texas. Notwithstanding anything to the contrary in the Governing Documents or any other document or agreement executed or made in connection with the Association's collection of assessments, the Association will not in any event be entitled to receive or collect, as interest, a sum greater than the maximum amount permitted by applicable law. If from any circumstances whatsoever, the Association ever receives, collects, or applies as interest a sum in excess of the maximum rate permitted by law, the excess amount will be applied to the reduction of unpaid special and regular assessments, or reimbursed to the owner if those assessments are paid in full.

Unofficial Copy



ClibPDF - www.fastio.com

Unofficial Copy

## ARTICLE 8
## EFFECT OF NONPAYMENT OF ASSESSMENTS AND VIOLATION OF THE DOCUMENTS

8.1. COLLECTING DELINQUENT ASSESSMENTS. An assessment is delinquent if the Association does not receive payment in full by the assessment's due date. The Association, acting through its board, is responsible for taking action to collect delinquent assessments. Neither the board nor the Association, however, is liable to an owner or other person for its failure or inability to collect or attempt to collect an assessment. The following remedies are in addition to and not in substitution for all other rights and remedies, which the Association has.

8.1.1. Interest. Delinquent assessments are subject to interest from the due date until paid, at a rate to be determined by the board from time to time, not to exceed the lesser of 18 percent or the maximum permitted by law. If the board fails to establish a rate, the rate is 12 percent per annum.

8.1.2. Late Fees. Delinquent assessments are subject to reasonable late fees, at a rate to be determined by the board from time to time.

8.1.3. Costs of Collection. The owner of a lot against which assessments are delinquent is liable to the Association for reimbursement of reasonable costs incurred by the Association to collect the delinquent assessments, including attorney's fees and processing fees paid by the Association for the collection thereof.

8.1.4. Acceleration. If an owner defaults in paying an assessment that is payable in installments, the Association may accelerate the remaining installments on 10 days' written notice to the defaulting owner.

8.1.5. Suspension of Use and Vote. If an owner's account has been delinquent for at least 30 days, the Association may suspend the right of owners and residents to use common areas and common services during the period of delinquency. The Association may also suspend the right to vote appurtenant to the lot. Suspension does not constitute a waiver or discharge of the owner's obligation to pay assessments

8.1.6. Money Judgment. The Association may file suit seeking a money judgment against an owner delinquent in the payment of assessments, without foreclosing or waiving the Association's lien for assessments.

8.1.7. Foreclosure of Assessment Lien. As provided by this Declaration, the Association may foreclose its lien against the lot by judicial or nonjudicial means.

8.1.8. Application of Payments. The board may adopt and amend policies regarding the application of payments. After the Association notifies the owner of a delinquency, any payment received by the Association may be applied in the following order: individual assessments, special assessments, and (lastly) regular monthly assessments. The Association may refuse to accept partial



ClibPDF - www.fastio.com

payments, i.e., less than the full amount due and payable. The Association may also refuse to accept payments to which the payer attaches conditions or directions contrary to the board's policy for applying payments. The Association's policy may provide that endorsement and deposit of a payment does not constitute acceptance by the Association, and that acceptance occurs when the Association posts the payment to the Lot's account.

8.2. ENFORCING THE DOCUMENTS. The remedies provided in this Section for breach of the Governing Documents are cumulative and not exclusive. In addition to other rights and remedies provided by the Governing Documents and by law, the Association has the following right to enforce the Governing Documents:

8.2.1. Nuisance. The result of every act or omission that violates any provision of the Governing Documents is a nuisance, and any remedy allowed by law against a nuisance, either public or private, is applicable against the violation.

8.2.2. Fine. The Association may levy reasonable charges, as an individual assessment, against an owner and his lot if the owner or resident, or the owner or resident's family, guests, employees, agents, or contractors violate a provision of the Governing Documents. Fines may be levied for each act of violation or for each day a violation continues, and does not constitute a waiver or discharge of the owner's obligations under Governing Documents.

8.2.3. Suspension. The Association may suspend the right of owners and residents to use common areas (with the exception of streets) for any period during which the owner or resident, or the owner or resident's family, guests, employees, agents, or contractors violate the Governing Documents. A suspension does not constitute a waiver or discharge of the owner's obligations under the Governing Documents.

8.2.4. Self-Help. The Association has the right to enter any part of the Property, including lots, to abate or remove, using force, as may reasonably be necessary, any erection, thing, animal, person, vehicle, or condition that violates the Governing Documents. In exercising this right, the board is not trespassing and is not liable for damages related to the abatement. The board may levy its costs of abatement against the lot and owner as an individual assessment. Unless an emergency situation exists in the good faith opinion of the board, the board will give the violating owner 15 days' notice of its intent to exercise self-help.

8.2.5. Suit. Failure to comply with the Governing Documents will be grounds for an action to recover damages or for injunctive relief to cause any such violation to be remedied, or both. Prior to commencing any legal proceeding, the Association will give the defaulting party reasonable notice and an opportunity to cure the violation.

8.2.6. No Waiver. The Association and every owner has the right to enforce all restrictions, conditions, covenants, liens, and charges now or hereafter imposed by the Governing Documents. Failure by the Association or by any owner to enforce a provision of the Governing Documents is not a waiver of the right to do so thereafter. If the Association does waive the right to enforce a provision, that



Unofficial Copy
ClibPDF - www.fastio.com

waiver does not impair the Association's right to enforce any part of the Governing Documents at any future time.

8.2.7. No Liability. No officer, director, or member of the Association is liable to any owner for the failure to enforce any of the Governing Documents at any time.

8.2.8. Recovery of Costs. The costs of curing or abating a violation are at the expense of the owner or other person responsible for the violation. If legal assistance is obtained to enforce any provision of the Governing Documents, or in any legal proceeding (whether or not suit is brought) for damages or for the enforcement of the Governing Documents or the restraint of violations of the Governing Documents, the prevailing party is entitled to recover from the nonprevailing party all reasonable and necessary costs incurred by it in such action, including reasonable attorney's fees.

8.3. NOTICE AND HEARING. Before levying a fine for violation of the Governing Documents (other than nonpayment of assessments), or before levying an individual assessment for property damage, the Association will give the owner written notice of the levy and an opportunity to be heard before the board. The Association may also give a copy of the notice to the resident. Pending the hearing, the Association may continue to exercise its other rights and remedies for the violation, as if the declared violation were valid. The owner's request for a hearing suspends only the levy of a fine or damage charge. The owner may attend the hearing in person, or may be represented by another person or written communication. The board may adopt additional procedures and requirements for notices and hearing.

## ARTICLE 9
## MAINTENANCE AND REPAIR BY THE ASSOCIATION

9.1. ASSOCIATION MAINTAINS. The Association shall have the right, but shall not be deemed obligated, to maintain, repair, and/or replace as a common expense, the portions of the Property listed below, regardless of whether the portions are on lots or common areas.

a. The common areas, including, without limitation.
b. Any real and personal property owned by the Association but which is not a common area, such as a lot owned by the Association.
c. Any area, item, easement, or service – the maintenance of which is assigned to the Association by this Declaration or by the plat.

9.2. OWNER RESPONSIBILITY. Every owner has the following responsibilities and obligations for the maintenance, repair, and replacement of the Property:

9.2.1. House Maintenance. Each owner, at the owner's expense, must maintain all improvements on the lot, including but not limited to the dwelling, fences, sidewalks, and driveways. Maintenance includes preventative maintenance, repair as needed. Each owner is expected to maintain his lot's improvements at a level, to a standard, and with an appearance that is commensurate with the neighborhood. Specifically, each owner must repair and replace worn, rotten,



Unofficial Copy

ClibPDF - www.fastio.com

deteriorated, and unattractive materials, and must regularly repaint all painted surfaces.

9.2.2. Yard Maintenance. Each owner, at the owner's expense, must maintain the yards on his lot at a level, to a standard, and with an appearance that is commensurate with the neighborhood. Specifically, each owner must:

a. Maintain an attractive ground cover of lawn on all yards visible from a street.
b. Edge the street curbs at regular intervals.
c. Mow the lawns and grounds at regular intervals.
d. Prevent lawn weeds or grass from exceeding 6 inches in height.
e. Not plant vegetable gardens that are visible from a street.

9.2.3. Responsible for Damage. An owner is responsible for his own willful or negligent acts and those of his or the resident's family, guests, agents, employees, or contractors when those acts necessitate maintenance, repair, or replacement to the common areas or the property of another owner.

9.3. OWNER'S DEFAULT IN MAINTENANCE. If the board determines that an owner has failed to properly discharge his obligation to maintain, repair, and replace items from which the owner is responsible, the board may give the owner written notice of the Association's intent to provide the necessary maintenance at owner's expense. The notice must state, with reasonable particularity, the maintenance deemed necessary and a reasonable period of time in which to complete the work. If the owner fails or refuses to timely perform the maintenance, the Association may do so at the owner's expense, which is an individual assessment against the owner and his lot. In case of an emergency, however, the board's responsibility to give the owner written notice may be waived and the board may take any action it deems necessary to protect persons or property, the cost of the action being the owner's expense.

9.4. SPECIAL FENCING. Declarant and/or the Association shall have the right, but not the obligation, to erect and/or install fences, walls and/or screening landscaping within (a) that portion of any Lot situated along the perimeter of the Addition(s), as shown on a Final Plat, or (b) on any portion of the Property not comprising any portion of a Lot (unless the lots are stated as common area herein) or dedicated street or alley. THE ASSOCIATION, AT ITS EXPENSE, SHALL BE OBLIGATED AND REQUIRED TO MAINTAIN, REPAIR AND/OR REPLACE SUCH FENCES, WALLS AND/OR SCREENING LANDSCAPING WITHIN (A) THAT PORTION OF ANY LOT SITUATED ALONG THE PERIMETER OF THE ADDITION ADJACENT TO A PUBLIC STREET, AS SHOWN ON A FINAL PLAT. IT SHALL BE THE OBLIGATION OF THE LOT OWNER TO MAINTAIN ANY SPECIAL FENCING INSTALLED BY DECLARANT THAT IS ADJACENT TO ANY PUBLIC PARK OR PRIVATE PROPERTY AND THE ASSOCIATION SHALL HAVE THE RIGHT, BUT NOT THE OBLIGATION, TO MAINTAIN, REPAIR AND/OR REPLACE THE SPECIAL FENCING INSTALLED BY DECLARANT THAT IS ADJACENT TO ANY PRIVATE OR PUBLIC PARK OR PRIVATE PROPERTY.

9.5. SPECIAL LANDSCAPING. Declarant and/or the Association shall have the right to grade, plant and/or landscape and maintain, repair, replace and/or change such grading,



Unofficial Copy

ClibPDF - www.fastio.com

planting and landscaping on any portion of the Property not comprising any portion of a Lot (unless the lots are stated as common area herein) or a dedicated street or alley or on any land dedicated to the City or on any portion of a Lot over which an easement has been reserved for the benefit of the Association.

9.6. DECLARANT'S DISCRETION. Notwithstanding any provisions herein to the contrary, the Declarant shall not be obligated to erect, install, maintain, repair or replace any fences, walls, sprinkler systems, grading, planting or landscaping on the Property.

9.7. TWENTY-YEAR LIMITATION. The provisions of this Section 9 regarding Declarant's rights shall terminate and be of no further force and effect from and after that date which is twenty (20) years after the recording of this Declaration. The rights of the Association shall continue throughout the term hereof.

## ARTICLE 10
## INSURANCE

10.1. GENERAL PROVISIONS. The provisions of this Article, with which the board will make every reasonable effort to comply, govern all insurance affecting the Property. The cost of insurance coverage and bonds maintained by the Association is an expense of the Association. Insurance policies and bonds obtained and maintained by the Association must be issued by responsible insurance companies authorized to do business in the State of Texas. The Association must be the named insured on all policies obtained by the Association. Each owner irrevocably appoints the Association, acting through its board, as his trustee to negotiate, receive, administer, and distribute the proceeds of any claim against an insurance policy maintained by the Association. Additionally:

10.1.1. Notice of Cancellation or Modification. Each insurance policy maintained by the Association should contain a provision requiring the insurer to give at least 10 days' prior written notice to the board before the policy may be canceled, terminated, materially modified, or allowed to expire, by either the insurer or the insured.

10.1.2. Deductions. An insurance policy obtained by the Association may contain a reasonable deductible, which will be paid by the party who would be liable for the loss or repair in the absence of insurance. If a loss is due wholly or partly to an act or omission of an owner or resident or their invitees, the owner must reimburse the Association for the amount of the deductible that is attributable to the act or omission, within the limits of the law of the State of Texas.

10.2. PROPERTY. To the extent it is reasonably available, the Association will obtain blanket all – risk insurance for insurable common area improvements. If blanket all-risk insurance is not reasonably available, then the Association will obtain an insurance policy providing fire and extended coverage. Also, the Association will insure the improvements on any lot owned by the association.

10.3. GENERAL LIABILITY. The Association shall make every effort to maintain a commercial general liability insurance policy over common areas—expressly excluding the liability of each owner and resident within his lot – for bodily injury and property damage resulting from the operation, maintenance, or use of the common areas. If the



ClibPDF - www.fastio.com

Unofficial Copy

policy does not contain a severability of interest provision, it should contain an endorsement to preclude the insurer's denial of an owner's claim because of negligent acts of the Association of other owners.

10.4. DIRECTOR & OFFICERS LIABILITY. To the extent it is reasonably available, the Association will maintain directors and officer's liability insurance, errors and omissions insurance, indemnity bonds, or other insurance the board deems advisable to insure the Association's directors, officers, committee members, and managers against liability for an act or omission in carrying out their duties in those capacities.

10.5. OTHER COVERAGES. The Association may maintain any insurance policies and bonds deemed by the board to be necessary or desirable for the benefit of the Association.

10.6. OWNER'S RESPONSIBILITY FOR INSURANCE. Each owner will obtain and maintain fire and extended coverage on all the improvements on his lot, in an amount sufficient to cover 100 percent of the replacement cost of any repair or reconstruction in event of damage of destruction from any insured hazard. Further, each owner will obtain and maintain general liability insurance on his lot. Each owner and resident is solely responsible for insuring his personal property in his dwelling and on the lot, including furnishings, vehicles, and stored items.

## ARTICLE 11
## AMENDMENTS

11.1. CONSENTS REQUIRED. As permitted by this Declaration, certain amendments of this Declaration may be executed by Declarant alone, or by the board alone. Otherwise, owners of at least a majority of the lots must approve amendments to this Declaration.

11.2. METHOD OF AMENDMENT. Except as provided in Article 12 below, at any time, the Owners may amend the Covenants, Conditions and Restrictions and/or any provision(s) set forth herein by executing an instrument containing such amendment(s) and recording same in the appropriate Property Records of the County; provided, however, that (i) for the period which the Declarant owns at least one Lot or easement no such amendment shall be valid or effective without the joinder and consent of Declarant and (ii) except as provided in Article 12 below, the procedure for such amendment shall first be approved by a 60 percent vote of the Association's Members.

11.2. TERMINATION. Except as provided in Article 12 below, at any time, the Owners may terminate and extinguish these Covenants, Conditions and Restrictions in their entirety by executing an instrument terminating such Covenants, Conditions and Restrictions and recording same in the appropriate Property Records of the County, provided, however, that (i) for the period in which the Declarant owns at least one Lot or easement, no such termination shall be valid or effective without the joinder and consent of Declarant and (ii) except as provided in Article 12 below, the procedure for such amendment shall first be approved by at least 60 percent of the votes of the Association's Members.

11.3. CONDEMNATION. In any proceeding, negotiation, settlement, or agreement concerning condemnation of the common area, the Association will be the exclusive representative of the owners. The Association may use condemnation proceeds to repair and replace any damage or destruction of the common area, real or personal, caused by



Unofficial Copy
ClibPDF - www.fastio.com

the condemnation. Any condemnation proceeds remaining after completion, or waiver, of the repair and replacement will be deposited in the Association's reserve funds.

## ARTICLE 12
## DECLARANT RIGHTS

12.1. SPECIFIC DECLARANTS RIGHTS. Notwithstanding anything herein to the contrary (in the event of any provision herein is in contradiction to this Article 12, in whole or in part, this Article 12 shall prevail), so long as Declarant, its successors or assigns, owns at least one (1) Lot or easement, Declarant shall have the sole right, but not the obligation, in its sole discretion, at any time, effective as of the date hereof, to control, perform and/or conduct the following:

12.1.1. Appoint (including itself) and/or substitute at any time the Board of Directors.

12.1.2. Terminate any or all of the Board of Directors.

12.1.3. Amend the Covenants, Conditions and Restrictions and any other Provisions under this Declaration, in whole or in part.

12.1.4. Enforce the Covenants, Conditions and Restrictions and other provisions provided for under this Declaration.

12.1.5. Review, determine and enforce the architectural control of the Lots, including the right to appoint the panel of the Architectural Control Committee.

12.1.6. Appoint, enlist, hire and/or retain a property management company in behalf of the Association as well as the right to terminate the services of any such management company at the Declarant's sole discretion.

12.1.7. Assigns its rights and obligations under this Declaration to any entity at any time, in whole or in part.

12.1.8. Have the authority to approve or disapprove any and all Phases and/or street right-of-way access, either public or private, to the Property from adjacent land.

12.2. DECLARANT'S SOLE DISCRETION. Declarant's rights set forth above are absolute in its sole discretion and do not require the approval, consent, or joinder of (i) any Owner, (ii) the Association, (iii) the Board of Directors, or (iv) any committees or other parties which may be established with respect hereto. At such time as the Declarant no longer owns a Lot or easement within the Property, all of such rights of enforcement shall revert to the Board of Directors of the Association.

12.3. RIGHTS TO ANNEX. Declarant may annex additional property to become a portion of the Property and thereafter be subject to the terms, provisions and conditions of these Covenants, provided that so long as the Class B membership exists, any such annexation by Declarant may require the prior approval of HUD or VA. Declarant may exercise such right by recording a Supplement to this Declaration in the Records of Wise County, Texas subjecting such additional property to the terms and conditions hereof. No further action or approval shall be required or necessary for the Declarant to annex additional



Unofficial Copy

ClibPDF - www.fastio.com

properties into the Property for the purpose of subjecting it to the Covenants. Any document subjecting additional property to the Declaration may also impose additional restrictions not found in this Declaration upon such additional property. Upon the annexation and platting of any additional property as herein provided, each lot described therein shall become a "Lot" for all purposes hereunder. Declarant reserves an exclusive right to control any and all future phases to **CHISHOLM SPRINGS** and such right shall survive the Declarant control period as set forth herein.

12.4. NO DUTY TO ANNEX. Nothing herein contained shall establish any duty or obligation on the part of Declarant or any member to annex any property to this Declaration and no owner of the property excluded from this Declaration shall have any right to have such property annexed thereto.

12.5. EFFECT OF ANNEXATION ON CLASS B MEMBERSHIP. In determining the number of Lots owned by Declarant for the purpose of Class B membership status the total number of Lots covered by this Declaration, including all Lots annexed thereto shall be considered. If Class B membership has previously lapsed but annexation of additional property restores the ratio of Lots owned by Declarant to the number required by Class B membership, such Class B membership shall be reinstated until it expires pursuant to the terms set forth in Section 6 and as may be found herein.

12.6. SPECIFIC DECLARANT RIGHTS TO AMEND DECLARATION. Declarant without joinder of the Board, the Association, or the other Owners may amend this Declaration to correct any errors or to cause the Declaration to be in compliance with any City or other governmental requirement (including any requirements imposed by the Federal Housing Administration, the Veterans Administration, the Department of Housing and Urban Affairs, the Federal Home Loan Mortgage Corporation, or the Government National Mortgage Association).

12.7. EASEMENT/ACCESS RIGHT. Declarant reserves a general easement over all Streets, roads, rights of way, alleys and utility, maintenance, landscaping, wall and other easements in the Property and over the balance of the Common Area for access for the purpose of finishing development of the Property as a subdivision and as otherwise reasonably necessary to affect Declarant's rights hereunder. Such easements and rights shall expire at such time that Declarant no longer owns a Lot.

12.8. ASSIGNMENT OF DECLARANT RIGHTS. Declarant may assign its rights to a successor Declarant hereunder by execution of a written document, recorded in Records of Wise County, Texas specifically stating that Declarant has assigned its rights as such to a designated assignee and declaring such assignee to be the new "Declarant" hereunder.

12.9. DECLARANT'S RIGHT TO INSTALL IMPROVEMENTS IN SETBACK AND OTHER AREAS. Declarant, in connection with development of the Property and construction of homes thereon, reserves the right but shall have no obligation to install or construct walls, fences, irrigation systems and other improvements in the setback areas (being the area on, along and/or between the boundary line of a Lot and the building or setback lines applicable to such Lot). If Declarant exercises such right in a setback area, then such wall, fence, irrigation system, or other improvement shall be the property of the Owner(s) of the Lot(s) upon which or adjacent to these are located, and such Owner(s)

Unofficial Copy



ClibPDF - www.fastio.com

shall maintain and repair any such improvement unless Declarant or the Association, by and through the Board, assumes such maintenance and repair obligations. If Declarant exercises such right in the above-described non-setback areas, then such wall, fence, irrigation system, or other improvement shall be the property of the Association. So long as it owns any Lot, Declarant shall have the right, but not the obligation, to maintain and repair any such non-setback area improvements; otherwise, the Association shall assume the maintenance and repair or it may abandon such improvements at its discretion. If the City requires the maintenance, repair, or removal of any such non-setback area improvements, the Association shall assume such responsibility at its expense. If the Association so abandons such non-setback area improvements or is properly dissolved, then the Owner(s) of the Lot(s) on or adjacent to which such improvements are located shall assume maintenance and repair at its expense.

12.10. REPLATTING OR MODIFICATION OF PLAT. From time to time, Declarant reserves the right to replat the Property or to amend or modify the Plat in order to assure a harmonious and orderly development of the Property as herein provided. Declarant may exercise such rights so long as it owns at least one Lot, in which case no joinder of any other Owner shall be required to give effect to such rights. By the acquisition of a Lot, each Owner acknowledges that he has read the Governing Documents and is advised of Declarant's right to replat the Property or to amend or modify the Plat, as Declarant deems necessary, and in Declarant's sole discretion. Moreover, each Owner further acknowledges, accepts and agrees that this right of Declarant is a benefit to each Owner and the Association. Each Owner, by acquisition of a Lot, consents to Declarant's execution of any replat on behalf of the Owner and the Association. However, any such replatting or amendment of the Plat shall be with the purpose of efficiently and economically developing the Property for the purposes herein provided or for compliance with any applicable governmental regulation. Declarant's rights under this Section shall expire at such time Declarant no longer owns a Lot.

12.11. LIMITATION OF DECLARANT LIABILITY. The Declarant shall not be responsible or liable for any deficit in the Association's funds. Declarant may, but is under no obligation to, subsidize any liabilities incurred by the Association and the Declarant may, but is not obligated to, lend funds to the Association to enable it to defray its expenses, provided the terms of such loans are on reasonable market conditions at the time.

12.12. TERMINATION OF DECLARANT'S RESPONSIBILITIES. In consideration of Declarant's deficit funding of the Association, if any, upon the occurrence of any of the following events: (i) conversion of Declarant's Class B membership status to Class A membership status; (ii) completion of any facilities in the Common Area by Declarant; or (iii) assignment of Declarant's rights hereunder pursuant to Section 12.8, then and in such event Declarant shall be fully released, relieved and forever discharged from any further duty or obligation to the Association or any of its members as Declarant by reason of the terms and conditions of this Declaration including any amendments thereof or supplements thereto, save and except the duties and obligations, if any, of Declarant as a Class A member by reason of Declarant's continued ownership of one or more Lots, but not otherwise. Further, and without regard to whether or not Declarant has been released from obligations and duties to the Association, so long as Declarant holds record title to at least one (1) Lot and holds same for sale in the ordinary course of business, neither the Association nor its Board, nor any member of the Association shall take any action that will impair or adversely affect the rights of the Declarant or cause the Declarant to suffer



Unofficial Copy
ClibPDF - www.fastio.com

any financial, legal or other detriment, including but not limited to, any direct or indirect interference with the sale of Lots. In the event there is a breach of this Section, it is acknowledged that any monetary award, which may be available would be an insufficient remedy and therefore, in addition to all other remedies, the Declarant shall be entitled to injunctive relief restraining the Association, its Board or any member of the Association from further breach of this Section.

## ARTICLE 13
## GENERAL PROVISIONS

13.1. COMPLIANCE. The owners hereby covenant and agree that the administration of the Association will be in accordance with the provisions of the Governing Documents and applicable laws, regulations, and ordinances, as same may be amended from time to time, of any governmental or quasi-governmental entity having jurisdiction over the Association or Property.

13.2. NOTICE. All demands or other notices required to be sent to an owner or resident by the terms of this Declaration may be sent by ordinary or certified mail, postage prepaid, to the party's last known address as it appears on the records of the Association at the time of mailing. If an owner fails to give the Association an address from mailing notices, all notices may be sent to the owner's lot, and the owner is deemed to have been given notice, whether or not he actually receives it.

13.3. LIBERAL CONSTRUCTION. The terms and provision of each Governing Document are to be liberally construed to give effect to the purposes and intent of the Governing Document. All doubts regarding a provision, including restrictions on the use or alienability of property, will be resolved in favor of the operation of the Association and its enforcement of the Governing Documents, regardless which party seeks enforcement.

13.4. SEVERABILITY. Invalidation of any provision of this Declaration by judgment or court order does not affect any other provision, which remains in full force and effect. The effect of a general statement is not limited by the enumeration of specific matters similar to the general.

13.5. CAPTIONS. In all Governing Documents, the captions of articles and sections are inserted only for convenience and are in no way to be construed as defining or modifying the text to which they refer. Boxed notices are inserted to alert the reader to certain provision and are not to be construed as defining or modifying the text.

13.6. POWER OF ATTORNEY. Each and every Owner and Member hereby makes, constitutes and appoints Declarant as such Owner's true and lawful attorney-in-fact coupled with an interest and irrevocable, for Owner and in Owner's name, place and stead and for Owner's use and benefit, to do the following:

A. to exercise, do or perform any act, right, power, duty or obligation whatsoever in connection with, arising out of, or relating to any matter whatsoever involving this Declaration and the Property;

B. to sign, execute, acknowledge, deliver and record any and all instruments which modify, amend, change, enlarge, contract or abandon the terms within this



Unofficial Copy

ClibPDF - www.fastio.com

Declaration, or any part thereof, with such clauses(s), recital(s), covenant(s), agreement(s), and restriction(s) as Declarant shall deem necessary, proper and expedient under the circumstances and conditions as may be then existing; and

C. to sign, execute, acknowledge, deliver and record any and all instruments which modify, amend, change, enlarge, contract or abandon the Subdivision Plan(s) of the Property, or any part thereof, with any easements and rights-of-way to be therein contained as the Declarant shall deem necessary, proper and expedient under the conditions as may then be existing.
The rights, powers and authority of said attorney-in-fact to exercise any and all of the rights and powers herein granted shall commence and be in full force and effect upon recordation of this Declaration in the Wise County Clerk's Office and shall remain in full force and effect thereafter until all Lots owned by the Declaration have been sold and conveyed by Declarant to Class A Members.

13.7. EXHIBITS. The exhibits listed below are attached to this Declaration and incorporated herein by reference. Because "EXHIBIT B", of this Declaration is destined to become obsolete, beginning 20 years after the date this Declaration is first recorded, this Declaration may be restated, re-recorded, or published without "EXHIBIT B", provided the other appendixes are not relettered. The automatic expiration and subsequent deletion of "EXHIBIT B", does not constitute an amendment of this Declaration. The Appendixes to this Declaration include:

A. Legal Description of the Land Subject to the Declaration of Covenants, Conditions & Restrictions for **CHISHOLM SPRINGS**;

B. Declarant Representations and Reservations

C. Acknowledgment by Acquisition

13.8. INTERPRETATION. Whenever used in the Governing Documents, unless the context provides otherwise, a reference to a gender includes all genders. Similarly, a reference to the singular includes the plural, the plural the singular, where the same would be appropriate.

13.9. DURATION. Unless terminated or amended by owners as permitted herein, the provision of this Declaration run with and bind the Property, and will remain in effect perpetually to the extent permitted by law.

*(End of Provisions)*

Unofficial Copy



ClibPDF - www.fastio.com

## EXHIBIT "A"

Legal Description of the Land (the Property)
subject to

## "THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS FOR CHISHOLM SPRINGS"

Real Property included and subject to the foregoing Declaration of Covenants, Conditions and Restrictions for **CHISHOLM SPRINGS**, Wise County, Texas:

1. **CHISHOLM SPRINGS**, recorded in Cabinet C, Slide 178 Plat Records of Wise County, Texas;

2. All lots, developed now or in the future which are used for single-family residential use, located within the property designated as **CHISHOLM SPRINGS**, Wise County, Texas, as depicted in a plat recorded in Cabinet C, Slide 178 with the Plat Records of Wise County, Texas;

*(End of "Exhibit A")*

Unofficial Copy



ClibPDF - www.fastio.com

# EXHIBIT "B"
# DECLARANT REPRESENTATIONS & RESERVATIONS

B.1. GENERAL PROVISIONS.

B.1.1. Introduction. Declarant intends the Declaration to be perpetual and understands that provisions pertaining to the initial development, construction, marketing, and control of the Property will become obsolete when Declarant's role is complete. As a courtesy to future users of the Declaration, who may be frustrated by then-obsolete terms, Declarant is compiling the Declarant-related provisions in this Appendix.

B.1.2. General Reservation & Construction. Notwithstanding other provisions of the Governing Documents to the contrary, nothing contained therein may be construed to, nor may any mortgagee, other owner, or the Association, prevent or interfere with the rights contained in this Appendix, which Declarant hereby reserves exclusively unto itself and its successors and assigns. In case of conflict between this Appendix and any other Governing Document, this Appendix controls. The Appendix may not be amended without the prior written consent of Declarant. The terms and provisions of this Appendix must be construed liberally to give effect to Declarant's intent to protect Declarant's interests in the Property.

B.1.3. Purpose of Development and Declarant Control Periods. This Appendix gives Declarant certain rights during the Development period and the Declarant Control Period to ensure a complete and orderly build out and sellout of the Property, which is ultimately for the benefit and protection of owners and mortgagees.

B.2. DECLARANT CONTROL PERIOD RESERVATION. Declarant reserves the following powers, rights and duties during the Declarant Control Period:

B.2.1. Officers & Directors. During the Declarant Control Period, Declarant may appoint, remove and replace any officer or director of the Association, none of who need be members or owners.

B.2.2. Declarant Assessments. During the Declarant Control Period, Lots owned by Declarant are not subject to assessment.

B.2.3. Builder Assessments. During the Declarant Control Period only, Declarant has the right but not the duty to reduce or waive the assessment obligation of a builder, provided the agreement is in writing.

B.2.4. Expenses of Declarant. Expenses related to the completion and marketing of the Property will be paid by Declarant or by Builders and are not expenses of the Association.

B.2.5. Budget Control. During the Declarant Control Period, the rights of owners to veto assessment increases or special assessments are not effective and may not be exercised.

B.2.6. Organizational Meeting. Within 90 Days after the end of the Declarant Control Period, or sooner at the Declarant's option, Declarant will call an organizational meeting of the members of the Association for the purpose of electing, by vote of the owners, directors to the board. Written notice of the organizational meeting must be given to an owner of



Unofficial Copy

ClibPDF - www.fastio.com

each lot at least 10 days before the meeting. For the organizational meeting, owners of 10 percent of the lots constitute a quorum.

B.2.7. Common Areas. At or prior to termination of the Declarant Control Period, Declarant will convey title to the common areas to the Association by deed – with or without warranty. At the time of conveyance, the common areas will be free of encumbrance except for the property taxes accruing for the year of conveyance. Declarant's conveyance of title is a ministerial task that does not require and is not subject to acceptance by the Association or the owners.

B.3. DEVELOPMENT PERIOD RESERVATIONS. Declarant reserves the following easements and rights, exercisable at Declarant's sole discretion, at any time during the Development Period:

B.3.1. Changes in Development Plan. Declarant may modify the initial development plan to respond to perceived or actual changes and opportunities in the marketplace. Subject to approval by the city, Declarant may (1) change the sizes, dimensions, and configurations of lots and street; (2) change the minimum dwelling size, (3) change the building setback requirements; and (4) eliminate or modify any other feature of the Property.

B.3.2. Builder Limitations. Declarant may require its approval (which may not be unreasonably withheld) of all documents and materials used by a Builder in connection with the development and sale of lots, including without limitation promotional materials; deed restrictions; forms for deeds, lot sales and lot closings. Without Declarant's prior written approval, a Builder may not use a sales office or model in the Property to market houses, lots, or other product located outside the Property.

B.3.3. ACC. During the Development Period, Declarant has the absolute right to appoint the Architectural Control Committee, consisting of any number of persons who serve at the pleasure of Declarant, and who may be removed and replaced by Declarant. Notwithstanding the foregoing, during the Development Period – after termination of Declarant Control, or earlier if Declarant permits – the board may appoint or serve as a "modifications committee" to respond exclusively to modifications of completed modifications committee may not involve itself with the approval of new homes on vacant lots.

B.3.4. Amendment. During the Development Period, Declarant may amend this Declaration and the other Governing Documents, without consent of other owners or any mortgagee, for the following limited purposes:

a. To add real property to the Property.
b. To withdraw real property from the Property.
c. To create lots, easements, and common areas within the Property.
d. To subdivide, combine or reconfigure lots.
e. To convert lots into common areas.
f. To modify the construction specifications of this Declaration
g. To merge the Association with another property owners association.
h. To comply with requirements of an underwriting lender.
i. To resolve conflicts, clarify ambiguities, and to correct misstatements, errors or omissions in the Governing Documents.



ClibPDF - www.fastio.com

Unofficial Copy

j. To enable any reputable title insurance company to issue title insurance coverage on the lots.
k. To enable an institutional or governmental lender to make or purchase mortgage loans on the lots.
l. To change the name or entity of Declarant.
m. To change the name of the addition in which the Property is located.
n. For any other purpose, provided the amendment has no material adverse effect on any right of any owner.

B.3.5. Completion. During the Development Period, Declarant has (1) the right to complete or make improvements indicated on the plat; (2) the right to sell or lease any lot owned by Declarant; and (3) an easement and right to erect, construct, and maintain on and in the common area and lots owned or leased by Declarant whatever Declarant determines to be necessary advisable in connection with the construction, completion, management, maintenance, leasing and marketing of the Property.

B.3.6. Easement to Inspect & Right to Correct. During the Development Period, Declarant reserves for itself the right, but not the duty, to inspect, monitor, test, redesign, correct, and relocate any structure, improvement, or condition that may exist on any portion of the Property, including the lots, and a perpetual nonexclusive easement of access throughout the Property to the extent reasonably necessary to exercise this right. Declarant will promptly repair, at its sole expense, any damage resulting from the exercise of this right. By way of illustration but not limitation, relocation of a screening wall located on any lot may be warranted by a change of circumstance, imprecise sitting of the original wall, or desire to comply more fully with public codes and ordinances. This Section may not be construed to create a duty for Declarant or the Association.

B.3.7. Promotion. During the Development Period, Declarant Reserves for itself an easement and right to place and relocate signs, banners, flags, display lighting, and seasonal landscaping on the Property, and to maintain models and sales offices for purposes of promoting, identifying, and marketing the Property and/or Declarant's houses, Lots, developments or other products located outside the Property. During the Development Period, Declarant also reserves (1) the right to permit Builders to place signs and promotional material on the Property and (2) the right to exempt Builders from the sign restriction in this Declaration.

B.3.8. Access. During the Development Period, Declarant has an easement and right of ingress and egress in and through the Property for purposes of constructing, maintaining, managing and marketing the Property and the Additional Land, and for discharging Declarant's obligations under this Declaration. Declarant also has the right to provide a reasonable means of access for the home-buying public through any existing or future gate that restricts vehicular access to the Property or to the Additional Land in connection with the active marketing of lots and homes by Declarant or Builders, including the right to require that the gate be kept open during certain hours and/or on certain days. This provision may not be construed as an obligation or intent to gate the Property.

B.3.9. Utility Easements. During the Development Period, Declarant may grant permits, licenses and easements over, in, on, under and through the Property for utilities, roads and other purposes necessary for the proper development and operation of the Property. Declarant reserves the right to make changes in and additions to the easements on any lot,



Unofficial Copy

ClibPDF - www.fastio.com

as shown on the plat, to more efficiently or economically install utilities or other improvements. Utilities may include, but are not limited to, water, sewer, fiber optic, trash removal, electricity, gas, telephone, television and security.

B.3.10. Transfer Fees. During the Development Period, Declarant may not be required to pay transfer-related fees and/or resale certificate fees.

B.3.11. Agent for Declarant. From time to time, Declarant may invite, request or employ one of its affiliates and/or a property/association management company, as its Agent, to share in the exercise of any, some, or all of its easements and rights, without any formality other than the consent of Declarant. Notwithstanding such sharing, Agent will not become a successor Declarant, or assume the duties and liabilities of Declarant under this Declaration unless Agent and Declarant join in an instrument that assigns and transfers Declarant rights and duties under this Declaration, signed and acknowledged by both Declarant and Agent, and recorded in the county's real property records.

B.4. SUCCESSOR DECLARANT. Declarant may designate one or more Successor Declarant's for specified designated purposes and/or for specified portions of the Property, or for all purposes and all of the Property To be effective, the designation must be in writing, signed and acknowledged by Declarant and Successor Declarant, and recorded in the real property records of Wise County, Texas. Declarant (or Successor Declarant) may subject the designation of Successor Declarant to limitations and reservations. Unless the designation of Successor Declarant provides otherwise, a Successor Declarant has the rights of Declarant under this section and may designate further Successor Declarant's.

*(End of "Exhibit B")*

Unofficial Copy



.ClibPDF - www.fastio.com

# EXHIBIT C
## Acknowledgment by Acquisition

By its acquisition and ownership of a Lot in the Property, each Owner acknowledges that:

(a) due to the topography of its Lot and the Property, water will, at times, flow through and over portions of its Lot from adjacent and surrounding Lots in order to achieve positive drainage away from all applicable Lots. No adverse action may be taken by said Owner(s) to the detriment of this positive drainage on its or adjacent Lots.

(b) the property adjacent to **CHISHOLM SPRINGS** is not owned or controlled by Declarant and it has hereby been advised to consult with the applicable departments of the City for any changes to and/or specific zoning information regarding its Lot, the Property and the zoning or proposed (re-)zoning of any adjacent property. It is also understood that there are no oral, written or implied representations or warranties regarding zoning or development of the Property or adjoining properties.

(c) its Lot may have "back-to-front" or "front-to-back" drainage. There may be a swale or swales over various portions of its Lot due to this drainage situation. The depth and width of any swales will vary depending on the elevations of its and adjacent Lots. The front and the rear portions of its Lot will not be level and no adjustments to the depth or severity of any swales should be made due to cosmetic or aesthetic concerns. Any alterations made after closing to any swales by an Owner may impact the drainage as well as any foundation warranty that it may own.

(d) its lot falls under the jurisdiction of the Homeowners' Association, which requires mandatory affiliation thereto, including the payment of an annual fee (which may be payable on a quarterly or other basis) per Section 7.3 of the Covenants, Conditions & Restrictions for **CHISHOLM SPRINGS**. It will also incur a working capital contribution fee and a transfer fee per Section 6.10 of the Declaration, which it understands should be further reviewed for more detailed information regarding Association dues, assessments and restrictions.

(e) it understands and agrees that neither Declarant nor Builder has any responsibility as to the present condition or future maintenance of any trees on its Lot. Furthermore, it is understood that neither Declarant nor Builder makes any assurances, implied or stated, in regard to the survival of any trees during the construction process of building and completing a Residence on its Lot. It is also acknowledged that neither Declarant nor Builder has any liability consideration on trees either during construction or after a Residence is purchased and occupied on the Lot. It is further understood that each Owner assumes all responsibility of the maintenance and the condition of any trees on his Lot.

(f) any modifications or additions to its Residence or any Structure on its Lot require prior submittal to and approval of plans and specifications by the Association's ACC pursuant to the Declaration. It is also understood that failure to so comply may result in the imposition of fines against the Owner and/or the removal of such modifications or additions at Owner's expense.

(g) there is no prescribed time for the construction or marketing by Builder or Declarant of a Residence on any Lot or the Lot itself. It is also understood that Builder and Declarant make no assurances regarding any established period of time during which Lots near the model homes or trailers of any Builder will remain vacant since the utility of such homes or trailers is of an indeterminate length of time.

Unofficial Copy



ClibPDF - www.fastio.com

(h) it should direct any issues, concerns or questions regarding the Common Area or the Association to the Managing Agent, whose name can be obtained by contacting the Builder or Declarant.

(End of "Exhibit C")

Unofficial Copy



ClibPDF - www.fastio.com

Executed this 9 day of November, 2006.

Address:
4890 Alpha Rd.
Dallas, TX 75244

Declarant: Jackson-Shaw/Chisholm Springs Limited Partners

By: ____________________
Vice President-Residential Development

STATE OF TEXAS §
§
COUNTY OF ~~WISE~~ Tarrant §

This declaration of Covenants, Conditions and Restrictions for CHISHOLM SPRINGS, was Acknowledged before me this 9 day of November, 2006 by Jackson-Shaw/Chisholm Springs Limited Partnership.

By: ____________________
NOTARY PUBLIC STATE OF TEXAS

Nina Cash
(Print Name)

My Commission Expires:
March 28, 2008

NINA CASH
Notary Public, State of Texas
My Commission Expires
March 28, 2008

Unofficial Copy



ClibPDF - www.fastio.com

THIS LABEL IS FOR SCANNING ONLY

Unofficial Copy



©LibPDF - www.fastio.com

Doc 397566 Bk OR Vol 1751 Pg 88

Wise County Title Company
Post Office Box 516
Decatur, Texas 76234

Filed for Record in:
Wise County
Honorable Honorable Sherry Parker-Lemon
County Clerk
On: Nov 14,2006 at 11:20A

As a
Official Records

Document Number: 397566

Amount 200.00

Receipt Number 162403
By
Linda Bryan, Deputy

ANY PROVISION HEREIN WHICH RESTRICTS THE SALE, RENTAL, OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW

STATE OF TEXAS COUNTY OF WISE

I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded in the volume and page of the named records of: Wise County as stamped hereon by me.

Nov 14, 2006

By, [signature] Deputy

Honorable Sherry Parker-Lemon, County Clerk
Wise County

Unofficial Copy

ClibPDF - www.fastio.com

**Wise County**
**HONORABLE Sherry Parker-Lemon**
**COUNTY CLERK**
**Decatur, Texas 76234**

70 2010 00054618

**Instrument Number: 2010-54618**
As
**Official Records**

**Recorded On: March 29, 2010**

**Parties: JACKSON-SHAW/CHISHOLM SPRINGS ET AL** — **Billable Pages: 5**
**To LGI HOMES-CHISHOLM SPRINGS LLC ET AL** — **Number of Pages: 6**

**Comment: AMENDMENT TO DECLARATION**

( Parties listed above are for Clerks reference only )

**** Examined and Charged as Follows: ****

| | |
|---|---|
| Official Records | 32.00 |
| **Total Recording:** | **32.00** |

Unofficial Copy

*************** DO NOT REMOVE. THIS PAGE IS PART OF THE INSTRUMENT ***************

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY because of color or race is invalid and unenforceable under federal law.

**File Information:**
Document Number: 2010-54618
Receipt Number: 223291
Recorded Date/Time: March 29, 2010 03:52:51P
Book-Vol/Pg: BK-OR VL-2134 PG-813
User / Station: A Lyons - Side Counter

**Record and Return To:**
CHISHOLM SPRINGS HOMEOWNERS ASSOC.
C/O JAMIE GORDON
6707 BRENTWOOD STAIR RD., SUITE # 110
FORT WORTH TX 76112

STATE OF TEXAS — COUNTY OF WISE

I hereby certify that this instrument was filed on the date and time stamped hereon and was duly recorded in the volume and page of the named records of Wise County.

**Sherry Parker-Lemon**
**Wise County Clerk**
Sherry Parker-Lemon

ClibPDF - www.fastio.com

# AMENDMENT TO DECLARATION OF COVENANTS, CONDITIONS & RESTRICTIONS FOR CHISHOLM SPRINGS

Reference is made to that certain instrument styled DECLARATION OF COVENANTS, CONDITIONS & RESTRICTION FOR CHISHOLM SPRINGS (herein the "Declaration") recorded in Volume 1751, Page 41 of the Official Records of Wise County, Texas;

Whereas, Lot 83R, Block B, located in the Chisholm Springs subdivision ("Chisholm Springs Subdivision"), located in Wise County, Texas, according to the Corrected Final Plat thereof recorded in Cabinet C, Sleeve 184-186 in the Map Records of Wise County, Texas, as amended in part by that certain Replat of Lots 1R-7R, 14R-25R and 28R-40R, Block F of Chisholm Springs recorded in Cabinet C, Sleeves 271 and 272, in the Map Records of Wise County, Texas (the "Lot"), has been sold;

Whereas, a consideration of the sale is the removal from ~~such~~ Lot all of the covenants, restrictions, and declarations, if applicable, to such Lot as set forth in the Declaration;

Now therefore, in consideration of the foregoing, the sufficiency of which is hereby confessed and acknowledged, Jackson-Shaw/Chisholm Springs Limited Partnership, Declarant under the Declaration, pursuant to Article 12 of the Declaration does, and by these presents, amend the Declaration so as to exclude the Lot from the Declaration and all covenants, restrictions, and declaration, if applicable, to the Lot from their force and effect.

LGI Homes-Chisholm Springs, ~~LLC, Successor~~ Declarant, has joined in this instrument to evidence its consent to the provisions hereof.

Executed effective as of March 9, 2009.

Jackson-Shaw/Chisholm Springs Limited Partnership,
a Texas limited partnership,
By: Pace Communities, Inc., a Texas corporation,
its General Partner

By: ______________________

LGI Homes-Chisholm Springs, LLC,
a Delaware limited liability company

By: ______________________
Eric T. Lipar, Manager

"Unofficial Copy"

AMENDMENT TO DECLARATION OF COVENANTS, CONDITIONS & RESTRICTIONS FOR CHISHOLM SPRINGS

Reference is made to that certain instrument styled DECLARATION OF COVENANTS, CONDITIONS & RESTRICTION FOR CHISHOLM SPRINGS (herein the "Declaration") recorded in Volume 1751, Page 41 of the Official Records of Wise County, Texas;

Whereas, Lot 83R, Block B, located in the Chisholm Springs subdivision ("Chisholm Springs Subdivision"), located in Wise County, Texas, according to the Corrected Final Plat thereof recorded in Cabinet C, Sleeve 184-186 in the Map Records of Wise County, Texas, as amended in part by that certain Replat of Lots 1R-7R, 14R-25R and 28R-40R, Block F of Chisholm Springs recorded in Cabinet C, Sleeves 271 and 272, in the Map Records of Wise County, Texas (the "Lot"), has been sold;

Whereas, a consideration of the sale is the removal from such Lot all of the covenants, restrictions, and declarations, if applicable, to such Lot as set forth in the Declaration;

Now therefore, in consideration of the foregoing, the sufficiency of which is hereby confessed and acknowledged, Jackson-Shaw/Chisholm Springs Limited Partnership, Declarant under the Declaration, pursuant to Article 12 of the Declaration does, and by these presents, amend the Declaration so as to exclude the Lot from the Declaration and all covenants, restrictions, and declaration, if applicable, to the Lot from their force and effect.

LGI Homes-Chisholm Springs, LLC, Successor Declarant, has joined in this instrument to evidence its consent to the provisions hereof.

Executed effective as of March 9, 2009.

Jackson-Shaw/Chisholm Springs Limited Partnership,
a Texas limited partnership,
By: Pace Communities, Inc., a Texas corporation,
its General Partner

By: ______________________________

LGI Homes-Chisholm Springs, LLC,
a Delaware limited liability company

By: ______________________________
Eric T. Lipar, Manager

Unofficial Copy

ClibPDF - www.fastio.com

STATE OF TEXAS )
COUNTY OF MONTGOMERY )

This instrument was acknowledged before me on ________________, 2010, by Eric T. Lipar, Manager of LGI Homes-Chisholm Springs, LLC, a Delaware limited liability company, for and behalf of the said LGI Homes-Chisholm Springs, LLC, and in the capacity herein stated.

Notary Public, State of Texas

STATE OF TEXAS )
COUNTY OF DALLAS )

This instrument was acknowledged before me on March 9th, 2010, by Lewis W. Shaw, II, President of Pace Communities, Inc., a Texas corporation, and the General Partner of Jackson-Shaw/Chisholm Springs Limited Partnership, a Texas limited partnership, for and behalf of the said Jackson-Shaw/Chisholm Springs Limited Partnership and in the capacity herein stated.

MARLA LINDQUIST
Notary Public, State of Texas
My Commission Expires
March 13, 2011

Marla Lindquist
Notary Public, State of Texas

Unofficial Copy

ClibPDF - www.fastio.com

STATE OF TEXAS )
COUNTY OF MONTGOMERY )

This instrument was acknowledged before me on March 9, 2010, by Eric T. Lipar, Manager of LGI Homes-Chisholm Springs, LLC, a Delaware limited liability company, for and behalf of the said LGI Homes-Chisholm Springs, LLC, and in the capacity herein stated.

NICOLE HOLLIS
Notary Public, State of Texas
My Commission Expires 04-22-2014

Notary Public, State of Texas

STATE OF TEXAS )
COUNTY OF DALLAS )

This instrument was acknowledged before me on ______________, 2010, by Lewis W. Shaw, II, President of Pace Communities, Inc., a Texas corporation, and the General Partner of Jackson-Shaw/Chisholm Springs Limited Partnership, a Texas limited partnership, for and behalf of the said Jackson-Shaw/Chisholm Springs Limited Partnership and in the capacity herein stated.

Notary Public, State of Texas

Unofficial Copy

# RESOLUTION OF DECLARANT APPOINTING OFFICERS AND DIRECTORS AND PERSONS WITH ACC AUTHORITY FOR CHISHOLM SPRINGS HOMEOWNER ASSOCIATION, INC.

In accordance with the powers granted to the Declarant by the Declaration, as Amended, the Declarant hereby issues this Resolution to document its appointments of the officers and directors, and persons with ACC Authority for Chisholm Springs Homeowners Association, Inc. The Declarant hereby appoints the following:

Directors:

1. Eric Lipar
2. Jack Lipar
3. Michael Snider

Officers:

1. President – Eric Lipar
2. Vice President – Jack Lipar
3. Secretary/Treasurer – Michael Snider

Persons with ACC Authority (each vested with the full power to act on ACC applications on behalf of the Declarant):

1. Eric Lipar
2. Jack Lipar

Appointments made, and effective on this 9th Day of March, 2010, by:

Declarant, LGI Homes – Chisholm Springs, LLC

By: ______________________
Eric Lipar, Authorized Agent

Resolution and appointments accepted on the 9th Day of March, 2010, by:

Chisholm Springs Homeowners Association, Inc.

By: ______________________
Eric Lipar, President

Unofficial Copy

ClibPDF - www.fastio.com